224 N.J. Super. 191 (1988)
539 A.2d 1276
THE RAMAPO BANK, PLAINTIFF-RESPONDENT,
v.
PAUL BECHTEL, DEFENDANT-APPELLANT, AND DANIEL REBISH, DEFENDANT.
PAUL BECHTEL, THIRD-PARTY PLAINTIFF,
v.
ANTHONY TROBIANO, THIRD-PARTY DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued March 7, 1988.
Decided April 7, 1988.
*193 Before Judges DREIER and BAIME.
Michael DeMarrais argued the cause for appellant (Browne, Buckalew & DeMarrais, attorneys; Michael DeMarrais, on the brief).
Daniel Kinburn argued the cause for respondent (Williams, Caliri, Miller & Otley, attorneys; Daniel Kinburn, of counsel and on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Defendant Paul Bechtel appeals from a summary judgment entered in favor of plaintiff Ramapo Bank, and from the denial of his motion to reopen the judgment on the grounds of newly discovered evidence. Based upon his written guaranty, he was held liable to plaintiff for the full amount owing to the Bank from Dantel Associates, Inc.
On June 8, 1981, plaintiff Ramapo Bank loaned $204,000 to Dantel Associates, Inc. Dantel Associates' two principals, defendants *194 Paul Bechtel and Daniel Rebish, and the third-party defendant, Anthony Trobiano, each signed a "Continuing Guaranty" personally guaranteeing payment of the loan. In November 1985 Dantel Associates defaulted on the loan payments, and in February 1986 plaintiff filed a complaint electing to collect the balance only from Bechtel and Rebish. Bechtel filed a third-party complaint against Trobiano asserting that if a judgment was rendered, Trobiano would be equally liable. In June 1986 the Bank filed a motion for summary judgment.
Defendant Bechtel began strongly to suspect that the Bank had made a specific agreement with Trobiano not to pursue him for any money due on the loan. Trobiano's certification accompanying the summary judgment motion mentioned that he understood that he "could never be held jointly responsible for any amount which remained due and owing upon any default of Rebish and Bechtel on the original loan." Also, attached to a proposed settlement document, forwarded to defendant from the Bank on September 23, 1986, was a letter dated March 27, 1986 from the Bank's attorneys to Trobiano which stated:
Several months ago, Pete Eddy prepared a document for you to sign which confirmed your prior guaranty and which would authorize Ramapo not to pursue your guaranty while chasing Bechtel, et al.... Although Ramapo will not be pressing any claim against you in this action, I'd like you to confirm that you have no objection to our representing Ramapo in this action.
On September 25, 1986 based on this information, defendant Bechtel filed a motion seeking leave to amend his pleadings to file an amended answer and third-party complaint alleging fraud in the inducement as a defense to the Bank's claim and as a separate claim against Trobiano. On September 26, 1986, the trial judge entered summary judgment in favor of the Bank, refusing to consider defendant's moving papers.
At the suggestion of the court, defendant filed a motion to set aside the judgment based on newly discovered evidence; but on October 24, 1986, the court denied the motion holding that as a matter of law there was no newly discovered evidence. The *195 court, however, permitted defendant to file an amended third-party claim against Trobiano.
In February 1987 a final judgment of $89,269.19 plus $9,685.30 in attorney fees was entered against defendant.[1] On April 6, 1987 the court entered partial summary judgment in favor of Bechtel and against Trobiano for $49,477.24, one-half of the amount Bechtel owed to the Bank. Since Bechtel's claim of fraud was still awaiting trial, discovery continued and included a deposition of Trobiano, affidavits of the two brokers who arranged the sale and an affidavit of the bank officer who arranged the financing. From this discovery, available to us under our order expanding the record, it appears that prior to the loan there was a specific agreement between the Bank and Trobiano that Trobiano would only be secondarily liable to the bank. Bechtel contends that he knew nothing about this agreement when his personal guaranty was sought by the Bank.
From the expanded record, especially the deposition testimony, the following appears. Defendant and Daniel Rebish, the principals in Dantel Associates, Inc., wanted to purchase the Cheshire Cat, a tavern, in 1981. The Bank contacted the brokers to tell them that the requisite secondary financing was conditioned upon the execution by Trobiano of a continuing guaranty. Defendant had no knowledge of this requirement nor did he know Trobiano. The brokers contacted Trobiano numerous times and asked him to personally guarantee the loan, but Trobiano refused. Trobiano finally agreed to guarantee the loan, however, when he was offered a release from another $150,000 guaranty, the payment of a $15,000 debt and a $20,000 debt owed to him from the former owners of the Cheshire Cat, $5,000 "[t]o sign as a secondary guarantor on a $204,000 note to Ramapo Bank", and when defendant "put up a second mortgage" on the Library, another tavern.
*196 Tony Gerbino, a Ramapo Bank loan officer, called Trobiano and told him that the Bank wanted his "signature as a secondary guarantor." When Trobiano asked Gerbino what "secondary" meant,
he said it meant that they would have to go after, I'll use that term, I don't know if that's the exact words he used, they would go after Rebish and Bechtel, the Cheshire Cat, them personally, after that they would go after the collateral of the Library, and that they could not sue me until they did all those things, I specifically asked that question.
Trobiano testified that he would not have signed his personal guaranty if he would have been equally liable with defendant on the guaranty. Trobiano signed the continuing guaranty at the closing without consulting the Bank, the brokers, or an attorney about why the document did not mention anything about a secondary guaranty. In exchange for the personal guaranty Trobiano received the $40,000 that he was promised.
Defendant testified that at the last meeting before the closing the Bank suddenly told him and Rebish that they needed to personally guarantee the loan. Defendant jumped up and walked out of the room, refusing to agree because "[t]hat wasn't the original deal, there was supposed to be no personal guarantees, Dantel Associates, Inc. was supposed to buy the Cheshire Cat." Defendant's former attorney, however, told him not to worry because "there would be a co-signer [Trobiano] that signed the note with Danny" and defendant. Defendant did not know Trobiano, and he testified that he never even heard the name Trobiano until the actual closing. Defendant testified that he would not have signed a personal note if Trobiano had not also personally guaranteed the debt.
From these depositions and affidavits it appears that the Bank was presented with a difficult dilemma: Trobiano would only agree to a secondary guaranty and defendant would only agree to joint and several primary liability with Trobiano.
The unresolved factual issue that must still be determined by the trial court is whether the Bank was exercising its contract right to pursue some rather than all of the guarantors *197 or whether the Bank made a prior agreement with Trobiano which was misrepresented to defendant and which fraudulently induced defendant into executing the continuing guarantee.[2]
A misrepresentation amounting to a "legal fraud" is a "material representation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment." Jewish Center of Sussex Cty. v. Whale, 86 N.J. 619, 624 (1981), citing Foont-Freedenfeld v. Electro-Protective, 126 N.J. Super. 254, 257 (App.Div. 1973), aff'd 64 N.J. 197 (1974). The Bank contends that defendant did not suffer any detriment, since a partial summary judgment has been entered against Trobiano in defendant's third-party claim for $49,477.24, which is exactly one-half of the judgment entered against defendant. The Bank argues that the alleged concealment cannot constitute fraud when "Bechtel's rights were precisely and entirely what he alleges he thought them to be." Defendant arguably may not have suffered any pecuniary loss. Nevertheless he claims that but for the alleged misrepresentations he would not have entered the agreement without the assurances of Trobiano's primary personal guaranty. Furthermore, the courts when pressed have stated "that where fraud is found damage may be presumed." Jewish Center of Sussex Cty. v. Whale, supra, 165 N.J. Super. 84, 90 (Ch. Div. 1978), aff'd 172 N.J. Super. 165 (App.Div. 1980), aff'd 86 N.J. 619 (1981), and cases cited therein.
Although there is no New Jersey case law directly on point with respect to guarantors as opposed to sureties, it is an accepted principle that "fraud operates to discharge the guarantor *198 from his liability on the guaranty, and may be set up by him as a defense to an action on the guaranty." 38 C.J.S., Guaranty § 32 at 1170-1171. The facts concealed, however, must be facts which if known by the guarantor would have prevented him "from obligating himself, or which materially increase his responsibility...." Id. at 1171. The New York Appellate Division has held that if the defense that the guaranty was procured by fraudulent representations is proven, then the note and the guaranty are invalid. J.D. Spencer Co., Ltd. v. New York Review, Inc., 282 App.Div. 659, 659, 122 N.Y.S.2d 161, 162 (App.Div. 1953), reargument and app. den. 282 App. Div. 759, 122 N.Y.S.2d 891 (1953).
N.J.S.A. 12A:1-203 imposes a basic obligation of fair dealing in commercial transactions. Cf. the general common-law duty of good faith and fair dealing implied in all contracts, Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 182 (1981). Section 1-102(3) prevents any disclaimer by agreement of that good faith obligation. Good faith is defined in § 1-201(19) as "honesty in fact in the conduct or transaction concerned." These provisions have been found to be a sufficient basis on which to bar a bank from invoking § 3-405 as a shield to a customer's claim of improper payment of embezzled checks, Kraftsman Container v. United Ctys. Trust Co., 169 N.J. Super. 488, 495-497 (Law Div. 1979), and to defeat a holder in due course status for a finance company which had knowledge of the quantity of defaults and repossessions in a "food plan and freezer deal," subjecting it to the defense of fraud in the inducement, Westfield Investment Co. v. Fellers, 74 N.J. Super. 575, 590-591 (Law Div. 1962).[3]
*199 On the basis of the papers presented by defendant, we must vacate the summary judgment order. The trial judge initially should have passed upon defendant's fraud claim and determined (1) whether the guaranty had been procured as the result of a concealed side agreement with Trobiano, and (2) if so, whether the Bank had committed fraud or had such unclean hands that the guaranty agreement should be vitiated. The "newly discovered evidence" added no new issue to the case; it merely established that the suspected agreement existed. Indeed, at oral argument before us the Bank so admitted, while disclaiming any nefarious purpose. The court therefore still must determine whether it was fraudulent to lead defendant to believe he was one of three persons who would be initially responsible, when, even before the transaction was consummated, the Bank intended to look only to defendant and his less-affluent partner, leaving defendant to his remedies against the third guarantor. There was, of course, no question that under the terms of the agreement a good faith decision by the Bank after the fact to look solely to any one or more of the guarantors was expressly authorized by the terms of the guaranty agreements; and this opinion shall in no way be considered any limitation upon that absolute right of choice. We merely differentiate such a good faith choice from a concealed pre-transaction agreement not to pursue a co-guarantor.
Since both the defendant and Trobiano have deposited the amounts of the respective judgments to stop the running of interest, there is clearly no problem of collectability which might occasion our remolding of the judgments to insure that defendant pays no more than half the amount now due. Bechtel is clearly responsible now for no more than one-half of the amount due. On remand the principal question will be whether *200 defendant's guaranty should have been discharged by the Bank's conduct.[4]
Reversed and remanded for trial in accordance with this opinion.
NOTES
[1] A default judgment was entered against Rebish, and according to defendant, a supplemental proceeding indicated Rebish's inability to repay the debt.
[2] Not presented here is any potential claim by Trobiano against the Bank for misrepresenting the legal effect of his guaranty, even if the Bank initially looked only to defendant for payment. The Bank apparently failed to explain to Trobiano that defendant possessed a common-law right of proportional reimbursement from any co-guarantor if forced to pay more than his pro rata share of the debt. D'Ippolito v. Castoro, 51 N.J. 584, 589-590 (1968).
[3] Fraud is also a valid ground for rescission of a contract. Rego Industries, Inc. v. American Mod. Metals Corp., 91 N.J. Super. 447, 456 (App.Div. 1966) (commercial contract); Jewish Center, supra, 86 N.J. at 626 (employment contract); Costello v. Porzelt, 116 N.J. Super. 380, 383 (Ch. Div. 1971) (marriage contract); Weintraub v. Krobatsch, 64 N.J. 445, 455 (1974) (contract for sale of house). But there would be a question here whether the entire loan agreement would be rescinded, requiring the Bank to be reimbursed, or merely the guaranty agreement. If this issue remains after remand, it should be resolved by the trial judge.
[4] In view of Bechtel's still pending fraud claim against Trobiano, the trial judge may choose to combine for trial the issues before us with the matters raised in the pending third-party claim.