711 A.2d 338 (1998)
312 N.J. Super. 51
CEDAR RIDGE TRAILER SALES, INC., a Corporation of the State of New Jersey, Plaintiff-Respondent, and
Joseph Barbagallo and Carmela Barbagallo, Plaintiffs,
v.
NATIONAL COMMUNITY BANK OF NEW JERSEY, a banking institution, Defendant-Appellant, and
Fleetwood Motor Homes of Indiana, Inc.; Fleetwood Motor Homes of Pennsylvania, Inc.; Fleetwood Credit Corporation; Fleetwood Enterprises, Inc.; Ganis Corporation; Richard D. Shanklin; National Community Banks, Inc.; Edwin B. Benson; and the Bank of New York, N.A. National Community Division, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued March 17, 1998.
Decided May 26, 1998.
*339 James H. Forte, Newark, for defendant-appellant (Saiber Schlesinger Satz & Goldstein, attorneys; Mr. Forte, James H. Aibel, Michael J. Geraghty and Thomas A. Della Croce, on the brief).
Ronald J. Picinich, Hackensack, for plaintiff-respondent (Picinich & McClure, attorneys; Mr. Picinich, William R. McClure and Douglas Nasta, on the brief).
Before Judges KEEFE, PAUL G. LEVY and WECKER.
The opinion of the court was delivered by
KEEFE, J.A.D.
Defendant, the Bank of New York, successor in interest to National Community Bank of New Jersey (hereinafter, the "Bank"), appeals from a judgment entered on a jury verdict against it in favor of plaintiff, Cedar Ridge Trailer Sales, Inc. (hereinafter "plaintiff" or "Cedar Ridge"), in the amount $600,000 for compensatory damages and $100,000 for punitive damages. We reverse for the reasons stated herein.
Cedar Ridge was a dealer/franchisee for Fleetwood Motor Homes of Indiana, Inc. (Fleetwood Indiana) and Fleetwood Motor Homes of Pennsylvania, Inc. (Fleetwood Pennsylvania), defendants, both of which manufactured Fleetwood Motor Homes. Fleetwood Credit Corporation (FCC), also a defendant, provided wholesale financing to dealers selling Fleetwood products, including Cedar Ridge. FCC, Fleetwood Indiana, and Fleetwood Pennsylvania are all subsidiaries of defendant Fleetwood Enterprises, Inc. (Fleetwood Enterprises).[1]
The litigation leading to this appeal stemmed from a series of events in November 1990, commencing with the Bank's refusal to provide an advance under one of Cedar Ridge's lines of credit because of defaults under certain loan documents, and its refusal to honor overdrawn checks in contravention of an alleged oral agreement to honor such overdrafts. Some of the checks the Bank returned in November of 1990 were *340 payable to FCC. This event eventually prompted Fleetwood to remove approximately twenty FCC-financed Fleetwood motor homes from Cedar Ridge's premises. The Bank also declared that Cedar Ridge was in default on its loans and "out of trust" with respect to its floor plan agreement. The Bank threatened to bring suit against Cedar Ridge, including repossession of floorplanned vehicles.
A "Workout Agreement" was entered into between Cedar Ridge and the Bank on January 4, 1991, which extended the relationship between Cedar Ridge and the Bank until April 1991. Details of the Workout Agreement will be discussed later in this opinion. Fleetwood terminated Cedar Ridge's franchises in January and February of 1991. On or about May 6, 1991, ITT, which had also provided financing for Cedar Ridge, paid Cedar Ridge's outstanding obligations to the Bank in full.
In August 1992, Cedar Ridge, Joseph Barbagallo, and Carmela Barbagallo, the principal officers and stockholders of Cedar Ridge, filed a complaint in the Law Division against the Bank, Fleetwood Indiana, Fleetwood Pennsylvania, FCC, Fleetwood Enterprises and Ganis Corporation (Ganis), another company that had provided financing to Cedar Ridge. The complaint was later amended to add two additional Bank officers as defendants, Richard G. Shanklin and Edwin B. Benson. Joseph and Carmela Barbagallo were eventually dismissed as plaintiffs from the complaint.
As against the Bank, Cedar Ridge sought compensatory and punitive damages for breach of contract and tortious interference with economic advantage. Plaintiff sought damages against the Fleetwood defendants based on their alleged illegal cancellation of the Fleetwood franchises. Cedar Ridge sought damages from Ganis for breach of its agreement with Cedar Ridge to provide retail financing to its customers and intentional interference with Cedar Ridge's contracts with customers.
The Bank raised as an affirmative defense, among other things, that the Workout Agreement constituted a release in settlement and/or a waiver of Cedar Ridge's claims. The Bank's motion for summary judgment to dismiss the suit on that ground was denied. The motion was again renewed prior to trial and denied again. The jury trial against all defendants spanned a period of twenty-two days. At the close of plaintiff's case, the trial court dismissed the claims against Benson and Shanklin as well as the Bank of New York, the Bank's parent company.
Pertaining to this appeal, the jury rendered its verdict in favor of Cedar Ridge, finding as follows: the Bank had a contract with Cedar Ridge regarding the payment of checks presented when there were insufficient funds in Cedar Ridge's account; the Bank breached that contract by refusing to pay three checks presented by FCC on Cedar Ridge's account that contained insufficient funds; the Bank breached its contract with Cedar Ridge regarding the used credit line when it refused to advance $43,000 on three titles delivered to it on November 17, 1990; the Bank intentionally interfered with Cedar Ridge's contract with FCC; and the Bank's intentional interference with Cedar Ridge's contract with FCC was a proximate cause of Cedar Ridge's damages. In total, the jury awarded Cedar Ridge $2,700,000 in compensatory damages: $600,000 against the Bank, $800,000 against FCC, $900,000 against Ganis, and $400,000 against FCC, Fleetwood Indiana, and Fleetwood Pennsylvania, jointly. In addition, Cedar Ridge was awarded $100,000 in punitive damages against the Bank, FCC and Ganis.
The Bank's motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial, was denied. The Bank, Fleetwood Enterprises, Fleetwood Pennsylvania, Fleetwood Indiana, FCC, and Ganis filed notices of appeal. All the appeals, with the exception of the Bank's, were dismissed after those parties settled with Cedar Ridge.
Numerous issues are raised by the Bank on appeal. We are satisfied from our review of the record and the parties' briefs, however, that we need not address all of them, inasmuch as we are satisfied that the trial court erred by denying the Bank's motion for involuntary dismissal based on the Workout Agreement. Accordingly, we focus *341 only on the facts necessary to define that issue.

I.
The Bank had a long standing relationship with Cedar Ridge and the Barbagalloes beginning in the late 1970's. The original credit line included a floor plan and security agreement. In general, the floor plan agreement required the Bank, in its discretion, to lend money to enable Cedar Ridge to purchase inventory. When an advance was made, the Bank completed a pre-signed promissory note including the amount advanced. At the Bank's discretion, Cedar Ridge would repay the note upon the sale of the inventory or in periodic installments. The Bank could deduct amounts due from other credit balances, and the loans were secured by Cedar Ridge's inventory and other collateral. The Bank had the right periodically to inspect the inventory and the other collateral to make sure that Cedar Ridge was not "out of trust." Cedar Ridge would be in default if it failed to repay principal or interest timely, failed to comply with any of the terms of the floor plan agreement or any other agreement, or when a change in Cedar Ridge's condition, financial or otherwise, led the Bank to believe that its security was impaired or risk enhanced. Upon default, the Bank had the right to accelerate all notes and to seize the collateral, and it could only waive its rights in writing. The Barbagalloes personally guaranteed the floor plan loans and their guaranty was secured by a second mortgage on their home.
In addition to the new credit line, the parties later established credit lines referred to as a used line, a sold line, and a cargo line.[2] Under the new credit line, Cedar Ridge would purchase a unit from the manufacturer, who would ship the unit to Cedar Ridge, and send the certificate of origin to the Bank. The Bank would debit the new line with the amount of the purchase and send a check to the manufacturer. When Cedar Ridge paid the note, the Bank would send the title. Under the used line, the Bank would transfer money into Cedar Ridge's checking account based upon the value of used vehicles submitted for financing by Cedar Ridge. There was some testimony, however, that the purpose of the used line was not so much to acquire inventory as it was to provide a source of operating revenue. A key term of each credit line agreement required Cedar Ridge to repay 10% of the principal for every ninety days a unit did not sell, which is known as a "curtailment."
By the fall of 1990, Cedar Ridge was behind in payments on interest and curtailments. On November 14, 1990, Cedar Ridge was overdrawn. On the same date, it paid off a unit financed under the used line with a $27,700 check of its own payable to the Bank. On November 15, 1990, the Bank returned that check for insufficient funds. The check was dishonored because, according to the Bank, Cedar Ridge was then past due in payment of curtailments and interest. It had also requested an advance that would put it over its credit line. Because of these and other events, the Bank was also concerned that Cedar Ridge was on the verge of bankruptcy.
There was conflicting evidence as to the Bank's refusal to advance $43,000 requested by Cedar Ridge on the used line. It is undisputed, however, that Cedar Ridge submitted titles to the Bank for certain used vehicles and requested a $43,000 advance on the used line. The Bank's position was that Cedar Ridge would have to pay past due interest and curtailments before the advance could be made. Upon hearing that Cedar Ridge could not make such payments, the Bank informed Cedar Ridge that it would deduct the interest and curtailments from the advance. According to the Bank, Cedar Ridge informed the Bank that if the money was deducted, Cedar Ridge would have to file for Chapter 11 protection. Based upon that information, the Bank denied the advance.
Five checks were returned on November 19, 1990, for insufficient funds in the amounts of $496.01, $1,400, $24,605, $35,270, and $42,475. The three larger checks were payable to FCC for sold units that had been financed on its wholesale floor plan. The dishonor of the three FCC checks began the sequence of events that ultimately resulted in the termination of Cedar Ridge's relationship with the Bank and Fleetwood.
*342 On the same day, the Bank conducted a floor plan check and discovered that nine units were missing, including four new units, three used units, and two cargo vans. Six had been sold and the other three were at different locations. The Bank received a check for one of the units the next day. According to the Bank, Cedar Ridge was out of trust on the four new units because it delivered them with twenty day temporary licenses, based upon executed finance contracts, but did not pay off the Bank's floor plan loans. On cross-examination by the Bank's attorney, Joseph Barbagallo admitted that Cedar Ridge was out of trust with the Bank at that time.
By letter dated November 19, 1990, Cedar Ridge advised Fleetwood Pennsylvania that Cedar Ridge could not pay its expenses, particularly the Fleetwood floor plan expenses, noting that its third quarter profits had decreased from "an average of 16 to 19 percent to 6.7 percent," resulting in a $132,000 loss. Cedar Ridge recommended the removal of "all Fleetwood and ITT financed motor homes immediately" to avoid the necessity of filing for bankruptcy. Cedar Ridge informed Fleetwood Pennsylvania that if a solution was not reached within five working days, Cedar Ridge would "have to seek protection," which Joseph Barbagallo admitted was a threat to file for bankruptcy.
On November 27, 1990, Cedar Ridge made a $117,192.69 deposit to its account, including three checks from Ganis, which represented retail loans on sold units for which FCC had provided the wholesale financing. Around this time, FCC advised Ganis that FCC's loans on these units had not been paid off and it was entitled to the proceeds from Ganis's retail loans represented by the checks. Upon hearing from FCC, Ganis stopped payment on the three checks because Cedar Ridge was on Ganis's watch list for failing to deliver titles on retail-financed units in a timely manner.
On November 28, 1990, the Bank received a call from Ganis advising the Bank that payment was being stopped on the three checks. In light of the stop payment, the Bank decided to return all checks presented for payment on Cedar Ridge's account. On December 3, 1990, the Ganis checks were returned to the account, and the account balance was reduced to reflect the fact that those funds were not in the account.
On December 6, 1990, the Barbagalloes and their attorney, Daniel Stolz, a bankruptcy specialist, attended a meeting at the Bank with, among others, defendants Shanklin and Benson and the Bank's attorney, James DeLuca. The purpose of the meeting was to discuss an arrangement whereby Cedar Ridge would pay off all of its loans from the Bank. At that meeting, the Bank handdelivered a letter of the same date to the Barbagalloes in which DeLuca advised Cedar Ridge that it was in default under the floor plan agreement and the notes issued in connection therewith. The letter demanded immediate payment of all amounts due to the Bank under the agreement and required Cedar Ridge to assemble all collateral at its place of business for repossession by the Bank. The next day, Fleetwood removed approximately twenty FCC-financed Fleetwood motor homes from Cedar Ridge's premises.
On December 17, 1990, DeLuca sent the first draft of a proposed Workout Agreement to plaintiff's counsel, Stolz. In response, Stolz informed DeLuca on December 20, 1990, that the agreement was "unacceptable" in its current form. He proposed, in the alternative, that the debt be paid off by May 1 rather than March 31; that the Bank not require regular monthly payments but accept weekly payments of "excess funds available, after the payment of essential operating expenses"; and, lastly, that the Barbagalloes' personal guaranty be accepted only on the used credit line. DeLuca responded on December 26 that the Bank was willing to accept weekly payments but all other terms were to remain as proposed by the Bank. He informed Stolz that he had been authorized to commence litigation if the Workout Agreement was not accepted by December 27.
Stolz replied on December 27 that he had recommended Cedar Ridge sign the Workout Agreement as amended and advised DeLuca that the Barbagalloes might consult personal counsel concerning the enforceability of their *343 personal guaranty. DeLuca forwarded a revised Workout Agreement to Stolz on December 28. DeLuca informed Stolz that he was making arrangements for an appointment with a Superior Court judge "in order to commence an action which seeks, inter alia, to recover the collateral." Accordingly, he demanded that the agreement be signed no later than January 2, 1991.
On January 2, Stolz replied to DeLuca's letter. He said that his clients now found the agreement "totally unacceptable" and that they believed the Bank's actions were "unjustified." Further, he informed DeLuca that Cedar Ridge had retained litigation counsel, and that it intended to "pursue a counterclaim" in the event the Bank instituted suit.
Cedar Ridge's litigation counsel, David Jubanowsky, contacted DeLuca on the same day. DeLuca sent Jubanowsky a copy of the verified complaint and order to show cause that he intended to file with Judge Van Tassel, with whom he had an appointment on January 4.
On January 3, Jubanowsky forwarded a copy of the Workout Agreement to Deluca with three proposed deletions. Specifically, Jubanowsky proposed that the Workout Agreement delete Cedar Ridge's acknowledgement that the debt was not "subject to any counterclaim, offset, defenses or rights or [sic: probably "of"] recoupment against NCB." With the exception of the three changes, he said that the agreement was "satisfactory in all other respects," and his clients were willing to sign it as modified.[3]
It is uncontroverted that Jubanowsky and Deluca met in the Bergen County Courthouse on January 4, engaged in settlement negotiations, and, as a result of those negotiations, Deluca informed Judge Van Tassel that the case was settled. On the same day, Deluca forwarded a revised Workout Agreement to Jubanowsky "in accordance with [the] discussions held at the Bergen County Courthouse on January 4, 1991." The revised agreement contained the exact amount of Cedar Ridge's indebtedness. In addition, the language that Cedar Ridge had found unacceptable in Jubanowsky's letter of January 3 was back in the agreement with an additional modifying clause. Paragraph 1 of the agreement now read in part:
Borrower and Guarantors acknowledge that the Indebtedness is not subject to any counterclaim, offset, defenses or rights o[f] recoupment against NCB. Notwithstanding the prior sentence in the event NCB takes physical possession of the Collateral and disposes of same, Cedar Ridge and the Barbagallos shall not be deemed to have waived their claim that the Collateral was disposed of in a commercially unreasonable manner. NCB agrees that in connection with this Workout Agreement it shall act in a commercially reasonabl[e] manner.
The agreement was signed by the Bank, Cedar Ridge, and the Barbagalloes on January 8, 1991.

II.
A Workout Agreement is "any action undertaken by a lender or secured party to prevent, mitigate, or cure a default by the borrower or to preserve or prevent diminution in the value of the security for the loan." Durfee, Papering The Workout, 389 PLI/ Real 631. Regardless of its purpose, it is essentially a contract and subject to the principles of interpretation governing contracts.
When the terms of the contract are not ambiguous, the construction and effect of that agreement is a matter of law which must be resolved by the court and not the jury. Booth v. Hartford Accident and Indem. Co., 125 N.J.L. 601, 603, 17 A.2d 591 (Sup.Ct.1941). The fact that such agreements may not be finalized until litigation is threatened, indeed when the parties are virtually in the courthouse, does not alter their essential nature. See Pascarella v. Bruck, 190 N.J.Super. 118, 124-25, 462 A.2d 186 (App.Div.), certif. denied, 94 N.J. 600, 468 A.2d 233 (1983); Honeywell v. Bubb, 130 N.J.Super. 130, 136, 325 A.2d 832 (App.Div. 1974). Forbearance from suit is adequate consideration to support a settlement agreement and bind the proposed defendant by its terms. See Pascarella, supra. That is so *344 even where one of the parties to the agreement is in financial difficulty, and the other party is seeking the best possible terms, i.e., "driving a hard bargain." Continental Bank of Pa. v. Barclay Riding Academy, 93 N.J. 153, 177, 459 A.2d 1163, cert. denied, 464 U.S. 994, 104 S.Ct. 488, 78 L. Ed.2d 684 (1983).
Thus, the Workout Agreement here was essentially a forbearance proposal in which the Bank agreed to withhold litigation, including repossession of collateral, on condition that Cedar Ridge pay the entire indebtedness by March 31, 1991. In return, Cedar Ridge acknowledged the terms of the floor plan and security agreement; the loans and notes made pursuant to those agreements; the Bank's security interest in collateral securing the loans; the fact that collateral had been sold out of trust; the fact that Cedar Ridge was in default in payment of curtailments and interest; and the specific sums of money that were owed the Bank under each credit line. Further, Cedar Ridge acknowledged in paragraph 1 of the Workout Agreement "that the Indebtedness is not subject to any counterclaim, offset, defenses or rights o[f] recoupment against NCB (the Bank)."
Despite the unambiguous wording of the agreement, Cedar Ridge and the Barbagalloes were permitted to essentially disavow it at trial. The trial judge treated the Workout Agreement as just another event in the long history of the parties' relationship. Thus, the judge permitted the jury to determine whether the Bank had a contract with Cedar Ridge requiring it to pay overdrafts, and whether the Bank breached its contract with Cedar Ridge regarding the used credit line when it refused to advance the $43,000. It is difficult for us to imagine what could be a clearer basis for set-off, recoupment, or counterclaim than those two issues.
On appeal, Cedar Ridge does not dispute the clarity of the wording of paragraph 1 of the agreement. Rather, it contends that it was only "one sentence consisting of 21 words ... in a seven-page workout agreement," and, as such, it could not possibly constitute a "waiver of Cedar Ridge's cause of action." We reject that argument.
While the operative words are few, the meaning could not be clearer. Further, the "21 words" cannot be considered in isolation as if they had no meaning in the context of the rest of the agreement and Cedar Ridge's earlier threat of litigation against the Bank. Moreover, the importance of paragraph 1 did not escape Cedar Ridge and its counsel. Those "21 words" were the subject of Cedar Ridge's specific objection and the subject of negotiations. It must be remembered that but for those terms and two other inconsequential deletions, the agreement was otherwise satisfactory to Cedar Ridge. Thus, it cannot be said that the wording of the paragraph now in dispute was either hidden from Cedar Ridge or went unnoticed by it. Indeed, the wording of the paragraph became acceptable to Cedar Ridge once the Bank agreed to be responsible for commercially unreasonable behavior if it should have to seize collateral under the agreement and sell it.
Nor can it be said that Cedar Ridge was unaware of the very claims that could have constituted a setoff or counterclaim. In a letter to the Bank dated December 31, 1990, Joseph Barbagallo said: "Personally, I feel tremendous harm was done to Cedar Ridge that should not have occurred; and I also feel that much of this harm was carefully throughout [sic: probably, "thought-out"]." In obvious reference to the Workout Agreement, he said: "please understand that based upon receipt of this contract and the demand of its execution, we are compelled to react more defensively to protect our rights, and provide us with an opportunity to continue." We conclude from this correspondence that Cedar Ridge knew of the claims it had against the Bank with reference to the overdrafts, as well as the Bank's failure to advance more funds on the used line of credit, and believed not only that the Bank breached its agreements with Cedar Ridge, but the breach caused it harm, and the harm was "carefully [thought-out]." Despite that position, both Cedar Ridge and the Barbagalloes signed the Workout Agreement on January 8 in which they acknowledged the full indebtedness and further acknowledged that it was not subject to set-off, counterclaim, or the like.

*345 III.
Cedar Ridge also contends that it could not have agreed to waive any claim against the Bank stemming from the cancellation of the Fleetwood franchises because the cancellation did not occur until after the Workout Agreement was signed. Thus, it reasons that "[b]ecause Cedar Ridge had not yet suffered the loss of its Fleetwood franchises... , there existed no accrued cause of action for Cedar Ridge to waive." The argument ignores the fact that the predicate for any action for tortious interference with contractual relations is premised on the Bank's alleged breach of its contract with respect to paying overdrafts and its allegedly unwarranted refusal to advance the $43,000 on the used credit line. These are causes of action that both accrued before Cedar Ridge signed the Workout Agreement and, as we have held, were barred by it.
The argument is also contrary to Joseph Barbagallo's letter of December 31 in which he contended that the Bank had caused Cedar Ridge harm in respect of its relations with Fleetwood and Ganis. It is undisputed that the Bank's refusal to pay the overdrafts and advance additional money to Cedar Ridge on its used credit line led FCC to request that Cedar Ridge surrender the FCC-financed vehicles and, ultimately, to the repossession of those vehicles on December 7. Further, following FCC's termination, on December 21 and January 4 the Fleetwood defendants advised Cedar Ridge in writing that Cedar Ridge could purchase vehicles on a "C.O.D. cashiers check only basis." It is difficult to fathom what harm Cedar Ridge's counsel had in mind, if not this harm, when he informed DeLuca that Cedar Ridge intended "to vigorously pursue a counterclaim against the Bank, in the event litigation is commenced...."
But even if we were to assume that Cedar Ridge's cause of action did not accrue until after the Workout Agreement was signed, it is of no avail to Cedar Ridge. That is so because Cedar Ridge simply failed to produce evidence sufficient to create a jury question on that issue.
To establish a claim for tortious interference with contractual relations, a plaintiff must prove:
(1) actual interference with a contract; (2) that the interference was inflicted intentionally by a defendant who is not a party to the contract; (3) that the interference was without justification; and (4) that the interference caused damage.
[214 Corp. v. Casino Reinvestment Dev. Auth., 280 N.J.Super. 624, 628, 656 A.2d 70 (Law Div.1994) (citing Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 751-52, 563 A.2d 31 (1989)).]
Interference with a contract is intentional "if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action." Restatement (Second) Torts, § 766A, comment e (1977). "An individual acts with malice when he or she intentionally commits a wrong without excuse or justification." Cox v. Simon, 278 N.J.Super. 419, 433, 651 A.2d 476 (App.Div.1995). However, the fact that a breaching party acted "to advance [its] own interest and financial position" does not establish the necessary malice or wrongful conduct. Sandler v. Lawn-A-Mat Chem. & Equip. Corp., 141 N.J.Super. 437, 451-52, 358 A.2d 805 (App.Div.), certif. denied, 71 N.J. 503, 366 A.2d 658 (1976).
As evidence of tortious interference, Cedar Ridge points to the Bank's failure to notify Cedar Ridge that it was not honoring the overdrawn checks or providing advances under the used line in accordance with the parties' course of dealing. This is the same claim Cedar Ridge made in connection with its breach of contract claims which we have already addressed.
In the Workout Agreement, Cedar Ridge acknowledged that it was in default of payments of interest and curtailment, and that it was out of trust with respect to certain collateral. It cannot now be permitted to claim otherwise, and it should not have been permitted to do so at trial. Accordingly, the Bank was not obligated under the terms of the floor plan and security agreements, which Cedar Ridge ratified in the Workout Agreement, to advance any additional money *346 to Cedar Ridge, especially unsecured loans which the payment of an overdraft essentially is. At worst, the Bank was advancing its "own interest and financial position," which is not enough to establish tortious interference. Sandler, supra. Thus, even if it can be said that Cedar Ridge's claim for tortious interference survived the Workout Agreement, it failed because the admissions contained in the Workout Agreement stripped it of a factual basis.
The judgment under review is reversed. The matter is remanded solely for the purpose of entering a judgment in favor of the Bank.
NOTES
[1] Fleetwood Indiana and Fleetwood Pennsylvania are at times referred to herein collectively as Fleetwood.
[2] The sold and cargo lines are unimportant to this appeal.
[3] The other two changes are not relevant to this appeal.