725 A.2d 1133 (1998)
319 N.J. Super. 435
NEW JERSEY ECONOMIC DEVELOPMENT AUTHORITY and Banque Nationale de Paris, Houston Agency, Plaintiffs-Respondents,
v.
PAVONIA RESTAURANT, INC., Ernesto A. Tolentino, James A. McLaughlin, Jr., Paul S. Freeman, Manmohan Patel, William H. Constad, Donald Cinotti, Vincas M. Vyzas, K. Joseph Vyzas, Samuel A. DiFeo, Joseph C. DiFeo, Eleanor Hartnett and H. Clay Irving, III, Defendants, and
Ray Vyzas, Francis E. Schiller, Eugene P. Squeo, John Seaholtz and Leona Seaholtz, Defendants-Appellants.
New Jersey Economic Development Authority and Banque Nationale de Paris, Houston Agency, Plaintiffs-Respondents,
v.
Pavonia Restaurant, Inc., Ray Vyzas, Francis E. Schiller, K. Joseph Vyzas, Eugene P. Squeo, Samuel A. DiFeo, Joseph C. DiFeo, Eleanor Hartnett, John Seaholtz, Leona Seaholtz and H. Clay Irving, III, James A. McLaughlin, Jr., Paul S. Freeman, Manmohan Patel, William H. Constad, Donald Cinotti and Vincas M. Vyzas, Defendants, and
Ernesto A. Tolentino, Defendant/Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted September 29, 1998.
Decided December 4, 1998.
*1135 Schiller & Sasso, Warren, for defendants-appellants Ray Vyzas, Francis E. Schiller, Eugene P. Squeo, John Seaholtz and Leona Seaholtz on A-4568-96T3 (Theodore E. Schiller, on the brief).
Margulies, Wind, Herrington & Knopf, Freehold, for defendant/appellant Ernesto A. Tolentino on A-5837-96T3 (no brief was submitted on behalf of this appellant).
Dilworth, Paxson, Kalish & Kaufman, Cherry Hill, for plaintiffs-respondents (Francis P. Maneri, on the brief).
Before Judges MUIR, Jr., KEEFE and EICHEN.
*1134 The opinion of the court was delivered by EICHEN, J.A.D.
In these consolidated appeals, defendants Ray Vyzas, Francis E. Schiller, Eugene P. Squeo, John Seaholtz and Leona Seaholtz, and Ernesto A. Tolentino (defendants), appeal from an order entered on February 6, 1997 granting summary judgment in favor of plaintiffs New Jersey Economic Development Authority (the EDA) and Banque Nationale de Paris (the Bank) in the sum of $1,530,392.88, and a subsequent order entered on March 21, 1997 denying their motion for reconsideration. We affirm.
The litigation arose out of the non-payment of a $1,470,000 loan (the loan) by the EDA and the Bank to Pavonia Restaurant, Inc. (Pavonia). Pavonia was established to open and operate a new restaurant to be located in a newly-constructed eight-story office building in downtown Jersey City. The proceeds of the loan were used to start the restaurant which was known as "Hudson's." Repayment of the loan was individually guaranteed by defendants,[1] who are mostly professional and local business people and, with one exception, are also stockholders in Pavonia.
After Pavonia and defendants defaulted in their obligations to repay the loan, plaintiffs commenced this action. Judge Thomas Brown granted summary judgment in favor of plaintiffs on their complaint, concluding there were no genuine issues of material fact on the enforceability of the guarantees. The judge also denied defendants' motion to file an amended responsive pleading. Thereafter, the judge denied defendants' motion for reconsideration, and this appeal ensued.
Because this is an appeal from the grant of summary judgment, we are required to accept defendants' evidence as true and to give them the benefit of all favorable inferences that can reasonably be drawn therefrom. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535-36, 666 A.2d 146 (1995); see also R. 4:46-2(c). Accordingly, we will summarize the pertinent facts of the case in accordance with those principles.
To acquire the funds necessary to make the loan, the EDA issued and sold Economic Growth Bonds, Composite Issue (1992 Series *1136 P Bonds) to investors. In order to encourage investment in the bonds, at the request of Pavonia and defendants, the Bank issued an irrevocable letter of credit pursuant to which it agreed to repay the bondholders in the event Pavonia defaulted.
On June 1, 1992, Pavonia executed a loan agreement, a promissory note, financing statements, and a security agreement pledging its leasehold improvements and restaurant equipment as security for repayment of the loan (the loan documents). On the same date, defendants executed a Personal Guaranty Agreement whereby they each agreed individually to guarantee repayment of the loan to Plaintiffs in the event of a default by Pavonia (the guarantees).
Due to a four-month delay in the opening of the restaurant, insufficient advertising, a high-priced menu, staffing problems, and the shareholders' failure to make the necessary capital contributions, Pavonia ran into financial difficulty and the loan went into default. Consequently, as of August 19, 1994, the arrearages due from Pavonia to the EDA equalled $241,207.71, and plaintiffs sought payment from defendants in accordance with their guarantees.
Thereafter, Pavonia and defendants requested plaintiffs to forbear enforcement of their rights under the loan agreement and guarantees. Plaintiffs agreed and, on October 17, 1994, the parties entered into a "Loan Forbearance Agreement." The agreement essentially provided that plaintiffs would not accelerate the loan balance for a period of time if defendants paid the delinquent amounts due and advanced monthly payments through December 1, 1994 totalling $312,970.19. In the agreement, defendants acknowledged that Pavonia had defaulted on the loan, that they had not cured the default, and that they had no defenses to plaintiffs' claims under the loan documents or individual guarantees.[2]
On February 1, 1995, Pavonia again defaulted, and plaintiffs accelerated the loan balance. In a letter dated June 22, 1995, counsel for plaintiffs made a demand upon defendants for full payment of the loan or possession of the assets Pavonia had pledged as collateral. When defendants failed to respond, on July 2, 1995, plaintiffs filed a complaint in replevin against Pavonia and defendants, seeking possession of the pledged assets and judgment in the amount of the loan balance, interest, counsel fees and costs. Plaintiffs also sought compensatory and punitive damages for conversion, wrongful detainer, and breach of contract. Defendants filed an answer, defenses, and a counterclaim, essentially asserting, among other defenses, that both plaintiffs and defendants were suffering under a mutual mistake of fact when the loan was granted because both parties "erroneously assumed that the business of Pavonia ... was capable of generating sufficient net revenue to enable defendant Pavonia" to repay the loan.
After extensive discovery, on December 18, 1996, plaintiffs moved for summary judgment. Defendants opposed the motion and cross-moved to amend their responsive pleadings to assert defenses grounded in fraud, bad faith, and allegations that plaintiffs had failed to disclose material facts at the inception of the loan that materially increased their risk under the guarantees rendering them unenforceable. Specifically, defendants alleged that from the inception of the loan, plaintiffs knew and failed to disclose (1) that Pavonia's assets were insufficient to secure the loan and (2) that plaintiffs were relying principally, if not exclusively, upon defendants' guarantees as the source of repayment of the loan.
Defendants supported their cross-motion with various deposition transcripts and documents, including two "memoranda" which they maintained demonstrated that plaintiffs had relied solely on the creditworthiness of defendants, whose collective net worth was in excess of $56 million dollars, to secure repayment of the loan. One memorandum was prepared on March 12, 1992 by Steven K. Szmutko, the senior loan officer of the EDA, and the other was a loan review document *1137 prepared on March 26, 1992 by Michael McKee, then vice-president of the Bank. The Szmutko memorandum dealt with the collateral for the loan. It indicated that plaintiffs needed more than the leasehold improvements and restaurant equipment as collateral, mentioning that the guarantors had a substantial net worth to secure the loan.
At his deposition, Szmutko explained the memorandum, indicating that the EDA used three factors to evaluate the loan: (1) the sufficiency of the anticipated cash flow from the restaurant business; (2) the quality of the proposed management; and (3) the sufficiency of the collateral pledged. He explained that "where[] one part or one component of the loan evaluation process [is] weak, ... [the EDA] seek[s] to mitigate that weakness by having ... additional personal guarantees or whatever ... additional collateral we can to strengthen it independent of the collateral." Szmutko stated that because the leasehold improvements and the restaurant equipment were not sufficient collateral to repay the loan in the event the restaurant failed, the creditworthiness of the guarantors was considered "the main source of repayment." However, he also stated that in evaluating the loan, he viewed the anticipated cash flow from the business as a significant source of repayment, noting the extensive business experience of Pavonia's president, defendant Ray Vyzas, and the restaurant's general manager who had previously directed operations of four different restaurants. Szmutko also testified that he had analyzed the financial statements prepared by Pavonia's accountant and that he relied upon the location and anticipated upscale clientele of the restaurant to generate a steady flow of income. Szmutko stated:
I had asked for financial statements prepared by an independent accounting group which was provided, Sobel & Company, which were projections of balance sheet income statements, probably the cash flow statement as well as the assumptions which we use to prepare the projections and assumption ranging from the revenue, what the average price and rates would be, whether that's consistent with other restaurants in Jersey City. We looked at it in terms of the value of the cash flow, the location of the restaurant which was near Journal Square which was in a building that was almost completely occupied and also in close proximity to other offices that would attract the type of clientele to this style of restaurant that they were proposing. We relied on the Sobel projections during the course of the evaluation process. I consulted with our director of finance, [Eugene Bukowski], and ultimately the project was presented to our board where we determined that the projections that were submitted by the applicant were reasonable.
The loan review document that McKee prepared contains his evaluation and analysis of the loan. The document indicates that the primary source of repayment of the loan would be Pavonia's cash flow from operation of the restaurant and that the secondary source would be the guarantors. In an affidavit, McKee explained exactly how he evaluated the loan. He stated that he had used projections prepared by Pavonia's accountant and that based on these projections, which he noted seemed reasonable, he believed that the restaurant could generate sufficient cash flow to repay its debts. In the affidavit, McKee clarified a comment he had made in the loan review document that "no value" was assigned to the cash flow generating ability of Pavonia or its collateral, explaining that "it was a start-up restaurant with no operational history, and therefore a value simply could not be placed on the [restaurant's] ability to generate cash flow."
Lloyd G. Cox, vice-president of the Bank, also testified at depositions and explained the criteria the Bank used in evaluating the loan:
We looked at this loan and I made the final decision to include it into the composite [bond issue]. We looked at this loan from the standpoint that it was a start-up restaurant, projections were provided that showed that the restaurant could have ample cash flow to repay the indebtedness. You had a large number of guarantors willing to guarantee the loan. These were professional, successful businessmen and women, I guess, attorneys, doctors, who lived and worked in this area so we placed *1138 reliance that they understood their market, they understood their home town, if you will, and that carried a lot of weight. We would not have entered into a relationship knowing that there was no chance that the restaurant would have made it and we would have had to collect against the guarantors.
Cox went on to state that, after analyzing the financial statements of the individual guarantors, he was satisfied Pavonia had the ability to repay the loan in the event of a default. With respect to the high-risk nature of the restaurant business, Cox stated the following:
I wouldn't have included it if I didn't think it had much of a chance of making it. I was relying on the New Jersey EDA having approved the loan and also relying on this group of professionals, successful business people who were willing to guarantee this loan and this venture, that they wouldn't have done so if they didn't think it had a likelihood of being successful.
Eugene Bukowski, the managing director of finance for the EDA agreed, testifying in his deposition that the financial projections prepared by Pavonia's accountant were conservative when compared with industry standards and, that according to the financial projections, it appeared that Pavonia's expected cash flow would be sufficient to repay the loan.
In granting summary judgment to plaintiffs and denying their motion for reconsideration, Judge Brown concluded that defendants had failed to support with sufficient evidential materials any of the theories they had advanced as defenses to the enforceability of the individual guarantees. In so doing, the judge observed that a party is not required to disclose information to another unless a fiduciary relationship exists. He also determined that plaintiffs were "not responsible to advise [defendants] of information that [was] readily available to them on their own." The judge found that "entering into a new restaurant arrangement [is] a high risk business, ... [and] that defendants knew what they were getting into" at the inception of the loan and also when they executed the forbearance agreement. The judge then denied defendants' cross-to amend their pleadings to allege fraud, breach of good faith, and failure to disclose a material risk, concluding the contentions were "moot based on the Court's decision on the [summary judgment] motion." The judge further stated that:
any of the asserted modifications to the pleadings at this late date are merely an effort to manufacture what might be a defense to hold up the proceeding until such time as there can be further motions made to strike them. I see nothing in anyany of the papers that were submitted to this court that would legitimately indicate that there was any fraud, breach of good faith, or failure to disclose on the part of the plaintiffs.
In denying defendants' motion for reconsideration, the judge added:
[T]here does not appear to be anything in the case that in any way suggests any fraud or bad faith on the part of any person in the bank. The fact that this was a restaurant, an operation which success is generally known to be questionable, also the fact, as I indicated, that the investors... are all businessmen ... they're not 87 year old widows who are living on what they inherited and want to invest the money.... [T]hese are businessmen who were fully aware of what the obligations were, not only when they entered into the surety agreement, but also when they entered into the forbearance agreement.
On appeal, although defendants raise arguments under numerous separate point headings, the arguments are essentially twofold: (1) that the evidence presented raised genuine issues of material fact from which inferences could be drawn of plaintiffs' bad faith, fraud, and breach of duty to disclose; and (2) that the judge abused his discretion in denying their motion to amend their responsive pleadings under R. 4:9-1.

I.
"Every fraud in its most general and fundamental conception consists of the obtaining of an undue advantage by means of some act or omission that is unconscientious *1139 or a violation of good faith." Jewish Ctr. of Sussex County v. Whale, 86 N.J. 619, 624, 432 A.2d 521 (1981). A plaintiff must establish a claim of fraud by clear and convincing evidence. Baldasarre v. Butler, 254 N.J.Super. 502, 521, 604 A.2d 112 (App.Div.1992), rev'd in part on other grounds, 132 N.J. 278, 625 A.2d 458 (1993). Legal fraud consists of five elements: (1) a material representation by the defendant of a presently existing or past fact; (2) knowledge or belief by the defendant of that representation's falsity; (3) an intent that the plaintiff rely thereon; (4) reasonable reliance by the plaintiff on the representation; and (5) resulting damage to the plaintiff. Id. at 520, 604 A.2d 112. Equitable fraud, unlike legal fraud, does not require knowledge of the falsity and an intent to obtain an undue advantage. Id. at 521, 604 A.2d 112.
Deliberate suppression of a material fact that should be disclosed is equivalent to a material misrepresentation (i.e., an affirmative false statement). Strawn v. Canuso, 140 N.J. 43, 62, 657 A.2d 420 (1995). In other words, "[s]ilence, in the face of a duty to disclose, may be a fraudulent concealment." Berman v. Gurwicz, 189 N.J.Super. 89, 93, 458 A.2d 1311 (Ch.Div.1981) (emphasis and citation omitted), aff'd, 189 N.J.Super. 49, 458 A.2d 1289 (App.Div.), certif. denied, 94 N.J. 549, 468 A.2d 197 (1983). However, the concealed facts "must be facts which if known ... would have prevented [the obligor] from obligating himself, or which materially increase his responsibility." Ramapo Bank v. Bechtel, 224 N.J.Super. 191, 198, 539 A.2d 1276 (App.Div.1988) (internal punctuation and citation omitted). Nonetheless, a party has no duty to disclose information to another party in a business transaction unless a fiduciary relationship exists between them, unless the transaction itself is fiduciary in nature, or unless one party "expressly reposes a trust and confidence in the other." Berman, supra, 189 N.J.Super. at 93-94, 458 A.2d 1311. Indeed, as a general proposition, creditor-debtor relationships rarely give rise to a fiduciary duty "inasmuch as their respective positions are essentially adversarial." Globe Motor Car Co. v. First Fidelity Bank, 273 N.J.Super. 388, 393, 641 A.2d 1136 (Law Div.1993), aff'd, 291 N.J.Super. 428, 677 A.2d 794 (App.Div.), certif. denied, 147 N.J. 263, 686 A.2d 764 (1996). Further, where information is equally available to both parties, neither party has a duty to disclose that information to the other. Id. at 395, 641 A.2d 1136.
We have carefully reviewed the entire record, the arguments and factual contentions presented, and prevailing legal principles and conclude that the motion judge properly determined that the evidence presented by defendants does not create a "genuine issue of material fact" under R. 4:46-2 requiring submission of their claims of fraud or bad faith to a jury. "[T]he evidence `is so one-sided that [plaintiffs] must prevail as a matter of law.'" Brill, supra, 142 N.J. at 540, 666 A.2d 146 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 213 (1986)).
Defendants claim that plaintiffs placed sole reliance on their individual guarantees for repayment of the loan. As reflected in the factual recitations previously given, the record does not support that assertion. Rather, it reflects that both plaintiffs and defendants anticipated that the revenues from the restaurant would support repayment of the loan. The information concerning the anticipated revenues was, in fact, derived from Pavonia's accountant, Sobel & Company. Although defendants maintain that the McKee loan review document concluded that "no reliance could be placed on the `collateral or cash flow generating ability of the restaurant,'" the record clearly belies this assertion. The record discloses that McKee believed, based on the projections made by Pavonia's accountant, that the restaurant would generate sufficient cash flow to repay the loan. As Lloyd Cox, vice-president of the Bank, indicated, the Bank never would have included the loan to Pavonia in the composite bond issue if it did not believe that Pavonia would be successful. Despite defendants' attempts to make it appear as though plaintiffs knew Pavonia would be unable to repay the loan and therefore insisted on the guarantees, nothing in the record supports this proposition. Defendants have not pointed to any *1140 evidence that even suggests plaintiffs had information about Pavonia's ability to repay the loan which defendants did not have. Indeed, everyone understood that opening a restaurant in a new location was an inherently risky business. Plaintiffs hoped that the restaurant's success would comport with the financial projections of Pavonia's accountant just as defendants did. The obvious fact is that external factors impeded Pavonia's success, factors which were completely unrelated to plaintiffs' evaluation of the loan agreements.[3]
In sum, defendants have utterly failed to demonstrate what facts plaintiffs had, but defendants lacked, that materially increased the risk beyond that which plaintiffs knew defendants intended to assume.
Impliedly recognizing that they could not prove their case under these theories, defendants argue that their claims are viable under the principles of law contained in the Restatement of Security: Suretyship § 124 (1941) (the Restatement).[4] That section provides in relevant part:
Where before [a] surety has undertaken his obligation the creditor knows facts unknown to the surety that materially increase the risk beyond that which the creditor has reason to believe the surety intends to assume, and the creditor also has reason to believe that these facts are unknown to the surety and has a reasonable opportunity to communicate them to the surety, failure of the creditor to notify the surety of such facts is a defense to the surety.
Defendants argue that plaintiffs violated these principles of law by failing to disclose facts to them that materially increased their risk under the guarantees, specifically, that unbeknownst to defendants, plaintiffs were relying on their guarantees as the primary security for repayment of the loan and failed to disclose this fact to them. They maintain they would not have undertaken the risk if they had known the guarantees were the principal security for the loan.
New Jersey typically gives considerable weight to Restatement views, and has on occasion even adopted those views as the law of this state. Citibank, N.A. v. Estate of Simpson, 290 N.J.Super. 519, 530, 676 A.2d 172 (App.Div.1996). Although we find it unnecessary to formally adopt the Restatement here, we have employed its principles, in part, to evaluate defendants' claims.
Section 124 prescribes three conditions precedent to imposing a duty on a creditor to disclose facts it knows about the debtor to the surety: (1) the creditor must have reason to believe that those facts materially increase the risk beyond that which the surety intends to assume; (2) the creditor must have reason to believe that the facts are unknown to the surety; and (3) the creditor must have a reasonable opportunity to notify the surety of such facts. See, e.g., Sumitomo Bank of Cal. v. Iwasaki, 70 Cal.2d 81, 73 Cal.Rptr. 564, 447 P.2d 956, 963 (1968).
However, the comments to Section 124 of the Restatement explain that:
[this rule] does not place any burden on the creditor to investigate for the surety's benefit. It does not require the creditor to take any unusual steps to assure himself that the surety is acquainted with facts which he may assume are known to both of them.
****
Every surety by the nature of his obligation undertakes risks which are the inevitable concomitants of the transactions involved. Circumstances of the transactions vary the risks which will be regarded as normal and contemplated by the surety.
[Restatement of Security: Suretyship § 124 cmt. b (1941) ].
For the reasons previously stated in our rejection of defendants' claims of fraud and bad faith, we are satisfied that defendants failed to raise any factual issue applying the principles derived from the Restatement. *1141 Suffice it so say, plaintiffs were not in possession of any facts that defendants were not aware of; both parties hoped the restaurant would generate sufficient cash flow to repay the loan. Regrettably, it did not.
Defendants' reliance on out-of-state cases are equally unavailing. All of the cases involve facts that are clearly distinguishable from those in the instant case. See Morris v. Columbia Nat'l Bank of Chicago, 79 B.R.777, 785-86 (N.D.Ill.1987) (observing that creditor may have acted in bad faith in allowing debtor to engage in a transaction favorable to the creditor but adverse to the surety, when creditor knew debtor was having financial problems); Camp v. First Fin. Fed. Sav. & Loan Ass'n, 299 Ark. 455, 772 S.W.2d 602, 604-05 (1989) (holding that failure to disclose to surety that interest on loan to debtor was delinquent and that lender was making secret side loans to debtor discharged liability of surety); Georgia Pacific Corp. v. Levitz, 149 Ariz. 120, 716 P.2d 1057, 1059 (1986) (holding that guarantor was discharged from liability on a continuing guarantee where creditor knew guarantor was unaware of debtor's insolvency but continued to extend credit to debtor, thereby materially increasing the guarantor's risk beyond that which guarantor intended to assume); Sumitomo Bank of Cal. v. Iwasaki, supra, 73 Cal.Rptr. 564, 447 P.2d at 966-67 (holding same); McHenry State Bank v. Y & A Trucking, Inc., 117 Ill.App.3d 629, 73 Ill.Dec. 485, 454 N.E.2d 345, 349 (1983) (concluding that a creditor's release of collateral without the consent of the guarantor will discharge the guarantor of his obligations); Maine Nat'l Bank v. Fontaine, 456 A.2d 1273, 1275-76 (Me.1983) (reversing jury verdict on judge's erroneous refusal to charge jury that creditor had duty to disclose to an accommodation party that it had terminated efforts on behalf of debtor to obtain a Small Business Association loan, and holding that jury could have determined that circumstance materially increased risk beyond that which accommodation party had agreed to take); Security Bank, N.A. v. Mudd, 215 Mont. 242, 696 P.2d 458, 460-61 (1985) (holding that creditor's failure to disclose its decision not to apply collateral to reduce debtor's loan discharged guarantor); see also Ramapo Bank v. Bechtel, supra, 224 N.J.Super. at 199, 539 A.2d 1276 (reversing summary judgment and remanding to trial court to consider whether concealed pre-loan side agreement by bank not to pursue a co-guarantor in event debtor defaulted in repaying loan constitutes fraud).
Finally, aside from the merits of the instant case, there is an additional reason why summary judgment was properly granted. The record clearly reflects that defendants waived their claims and defenses relating to the loan when they entered into the forbearance agreement. See Cedar Ridge Trailer Sales, Inc. v. National Community Bank, 312 N.J.Super. 51, 62-65, 711 A.2d 338 (App.Div.1998). Their assertion that the waiver is unenforceable because they lacked knowledge of plaintiff's alleged "fraud" until they conducted discovery is unavailing in view of the absence of any evidence of "fraud," as we previously noted.

II.
We also reject defendants' claim that the court abused its discretion in denying their motion to file an amended responsive pleading. The judge did not abuse his discretion when he noted that any "modifications to the pleadings at this late date [were] merely an effort to manufacture what might be a defense to hold up the proceeding until such time as there can be further motions made to strike them." See Stuchin v. Kasirer, 237 N.J.Super. 604, 609, 568 A.2d 907 (App.Div.) (holding that since the "showing of fraud was marginal at best, and the amendment would only have protracted [the] litigation." there was no abuse of judicial discretion in denying the amendment), certif. denied, 121 N.J. 660, 583 A.2d 346 (1990). While we recognize that such amendments should be "freely given in the interest of justice," R. 4:9-1, we perceive no abuse of discretion by the motion judge in determining to disallow the filing of an amended pleading to assert these new theories where they could not be supported on this record.
Accordingly, we affirm the summary judgment entered in favor of plaintiffs on their complaint.
NOTES
[1] For convenience and ease of reference, we use the term "defendants" to refer interchangeably to all of the individual guarantors and the defendants-appellants even though not all of the guarantors have participated in this appeal.

Although a notice of appeal was filed on behalf of K. Joseph Vyzas, Samuel E. Difeo, Joseph C. Difeo, Eleanor Hartnett, and H. Clay Irving, III, these guarantors did not file a brief. Consequently, we consider the appeal dismissed as to them.
Defendant Ernesto A. Tolentino filed a separate notice of appeal and a separate appendix, and he apparently has joined in defendants-appellants' brief. Accordingly, his appeal is considered perfected.
The guarantors James A. McLaughlin, Jr., Paul S. Freeman, Manmohan Patel, William H. Constad, Donald Cinotti, and Vincas M. Vyzas, did not file a notice of appeal.
[2] The forbearance agreement also states:

[Defendants] have no set-offs, defenses or counterclaims against [plaintiffs] with respect to the Indebtedness, and ... are indebted to the Secured Parties for the amounts recited in this Agreement.
[3] We note that although Pavonia was unsuccessful in establishing a viable restaurant business, its successor, Laico's of Journal Square, has not been.
[4] Section 124 of the Restatement was revised in 1996. See Restatement (Third) of Suretyship and Guaranty § 12 (1996). However, there were no substantive changes to the section that affect this decision.