810 A.2d 610 (2002)
355 N.J. Super. 390
CENTER 48 LIMITED PARTNERSHIP, Plaintiff-Respondent,
v.
The MAY DEPARTMENT STORES COMPANY, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued September 25, 2002.
Decided December 5, 2002.
*612 John J. Reilly, Newark, argued the cause for appellant (Gibbons, Del Deo, Dolan, Griffinger & Vecchione, attorneys; Mr. Reilly, Mary L. Frontczak, of the Missouri bar, admitted pro hac vice, and C. Michelle Mitchell-Bromfman, St. Louis, MO, of the Missouri bar, admitted pro hac vice, on the brief).
Robert C. Epstein, Morristown, argued the cause for respondent (Duane Morris, attorneys; Mr. Epstein, on the brief).
Before Judges EICHEN, FALL and WEISSBARD.
*611 The opinion of the court was delivered by WEISSBARD, J.A.D.
In this suit to enforce a guaranty of a lease agreement, we are called upon to decide whether a modification of the underlying leasewhereby the lessor became a long term leaseholder rather than fee owneroperates to discharge the guarantor. We conclude that in order to effect a discharge of the guarantor, an alteration or modification of the underlying lease must either injure the guarantor or actually increase the guarantor's risk or liability. Since we determine that the modification in this case neither injured the guarantor nor increased its risk or liability under the contract of guaranty, we affirm the judgment entered against the guarantor. We also affirm an award of attorney's fees pursuant to the frivolous litigation statute. N.J.S.A. 2A:15-59.1.
On July 31, 1985, Caldor, Inc. (as tenant) entered into a lease with Robert C. Baker, individually and as trustee under the Robert C. Baker Family Trust dated March 15, 1984 (Baker), and Harvey B. Oshins (collectively as landlord), for premises in the Voorhees Shopping Plaza on Haddonfield-Berlin Road in Camden County. The terms "landlord" and "tenant" as used in the lease included successors and assigns of both parties. The landlord warranted and represented to Caldor, "upon which warranties and representations [Caldor] has relied in executing and delivering this lease," that it was the owner in fee simple of the leased premises. Possession of the premises was to be delivered to Caldor "free and clear of all restrictions and encumbrances" except as otherwise noted in the lease agreement. Upon Caldor's paying the rent and performing and observing all required agreements and conditions, it "shall and may peaceably and quietly have, hold and enjoy the demised premises and all rights of Tenant hereunder during the term of this lease without any manner of hindrance or molestations, subject, however, to the terms, covenants and conditions of this lease."
The original term of the lease was for twenty-five years, with options to renew. Annual rent was $491,592 per year, plus a certain percentage of Caldor's gross sales.
In the event Caldor defaulted in the payment of rent and did not cure such default, the landlord could terminate the lease provided certain notice requirements were met. In the case of such termination, Caldor agreed to indemnify the landlord against all loss of rent for the period of time between termination and the date for expiration of the lease, and Caldor agreed to be responsible for any expenses incurred in the landlord's obtaining possession of the premises and reletting.
In the event of a Chapter 11 bankruptcy proceeding by Caldor, the bankruptcy trustee had to elect to assume the lease within a certain time frame or be deemed to have rejected it. In the event Caldor was declared insolvent, the landlord had the right to terminate the lease.
*613 On July 31, 1985, the same date as this lease was executed, Associated Dry Goods Corporation (Associated) executed a guarantee agreement in consideration of the landlord's having executed the lease at the request of Associated. Caldor was a wholly-owned subsidiary of Associated, although Caldor operated separate and apart from Associated. According to this guarantee agreement,
Associated hereby unconditionally guarantees to Landlord the payment of the rents provided for in said Lease and the payment, performance and observance of all agreements and conditions contained in said Lease on the part of Tenant to be paid, performed or observed. Any assignment of the Lease or any subletting of the Demised Premises or any modification of the Lease, or waiver of the performance thereunder, or the giving by Landlord of any extensions of time for the performance of any of the obligations of Tenant, or any acceptance of rent after any default of Tenant, or any forbearance on the part of Landlord, or any failure by Landlord to enforce any of its rights under the Lease, or this Guaranty, or any failure by Associated to receive notice of any such actions or in-actions, shall not in any way release Associated from liability hereunder, or terminate, affect or diminish the validity of this Guaranty, except to the same extent, but only to such extent, that the liability or obligation of Tenant is so released, terminated, affected or diminished. Notice to Associated of acceptance of this Guaranty, or any such modification, waiver, extension, forbearance or failure or of any default by Tenant is hereby expressly waived.

The provisions of this Guaranty shall be binding upon Associated and its successors and assigns and shall inure to the benefit of Landlord and its heirs, legal representatives, successors and assigns.
[emphasis supplied]
On August 1, 1986, Caldor (as tenant) and Baker, Oshins, Gregory J. Stepic, John G. Orrico, Marc Golden and Michael Plaskon (collectively as landlord), entered into a modification of the July 31, 1985, lease, whereby the demised premises were changed to certain property situated in the Boroughs of Somerdale and Magnolia, on Evesham Avenue and White Horse Pike, in Camden County. The modification was approved and accepted (and separately executed) by Associated as guarantor, and the guarantee agreement was "hereby ratified, confirmed, dated and deemed applicable to the Lease as modified by the within Modification of Lease."
On March 23, 1987, the same parties entered into a second lease modification, which merely substituted a new lease plan attachment for the prior one. In all other respects, the provisions of the original lease continued in full force and effect. This modification was not separately acknowledged or signed by Associated.
In 1980, Baker started a company known as National Realty Development Company, which developed and managed commercial real estate, primarily strip shopping centers. National Realty was the managing agent for the shopping center in which Caldor leased its store. Baker was involved in, and had relationships with, various entities and family trusts in addition to National Realty. This is why the definitions of "landlord" under the Caldor lease, the first modification to the lease, and the second modification to the lease, differed from one another. That is, at various times, Baker gave different individuals, such as Plaskon, Stepic, Orrico, and Golden, interests in properties he owned and/or managed.
*614 Although the Caldor lease was signed in 1985, Caldor did not actually take occupancy until 1987 or 1988 because the shopping center had to be constructed. Baker explained that, at one point, either National Realty, or a related entity, had been under contract to buy the Voorhees property which was the subject matter of the original Caldor lease. However, because zoning approvals could not be obtained, a new site was found nearby, the one referred to in Caldor's lease modification of August 1, 1986. Hence, Caldor never operated out of the Voorhees site.
At some point, National Realty's transaction with the owner of the property changed from a sale to a land lease due to capital gain considerations. That is, on December 30, 1986, a company known as National Holding Corp., of which Baker was the major shareholder, entered into a thirty-year ground lease (with eight successive options to renew, for additional terms of ten years per option) with Somerdale Realty Co., Inc., the actual owner of the property. No one at National Realty or in the Baker family trust had any ownership interest in Somerdale Realty.
At the time Caldor signed the original lease on July 1, 1985, and again at the time it signed the lease modification of August 1, 1986, Somerdale Realty owned the underlying land. The "Baker entities," as landlord on the Caldor lease, then leased the premises to Caldor without actually owning the land.
According to the terms of the ground lease between Somerdale and National Holding, National Holding was allowed to use the premises as if it were the owner, and had the right to construct a shopping center on the premises and to sublease the premises. Any sublease was to be subordinate to the ground lease. All terms of the ground lease between Somerdale and National Holding ran with the land and inured to the benefit of and were binding upon the successors and assigns of each party.
Baker claimed that both Caldor and Associated knew that the Baker entities never took ownership to the land because Baker was in constant communication with Alan Kuller, a senior vice president of Caldor. According to a certification of Kuller dated August 19, 2000, Kuller did not remember Baker telling him that the Baker entities did not own the property and that Caldor's lease was actually a sublease. If he had known, Kuller would have insisted on a non-disturbance agreement with the owner of the land.
However, four days later, on August 23, 2000, Kuller executed another certification after recalling certain conversations he had with Baker. In this certification, Kuller stated that Baker did tell him that his company was going to enter into a long-term ground lease with the owner rather than purchase the property. This information was entirely acceptable to Caldor. That is, Caldor knew that the "landlord" under its lease was itself a lessee of the ground and owned only the improvements thereon.
According to Arthur O'Day, Associated's then vice president, he did not remember either Baker or Kuller telling him that the landlord under the Caldor lease did not own the property. To the best of O'Day's knowledge, Baker did not tell anyone else at Associated of this fact. Baker admitted that he did not talk to anyone at Associated, and he did not personally know whether anyone at Associated was told that the sale of the land had changed to a ground lease.
In October 1986, defendant, The May Department Stores, acquired all of the stock of Associated and Associated became a wholly owned subsidiary of defendant. *615 In November 1989, defendant sold Caldor, Inc., and Caldor, Inc. became a wholly owned subsidiary of Caldor Corp. On March 28, 1990, John M. Manos, then Associated's vice-president, wrote to National Realty in conjunction with National Realty's seeking of permanent financing on the Somerdale shopping center. In this letter, Manos confirmed that Associated was the guarantor on the Caldor lease.
In February 1992, Associated merged into defendant, with defendant as the surviving corporation. Vincent A. Corno, a real estate executive with defendant, claimed that defendant was not aware of any of the circumstances surrounding either the execution of the Caldor lease or the Associated guarantee and that it had no connection to those entities at the time those documents were executed.
On July 21, 1987, National Holding assigned its interests in the ground lease to the Baker entities who were named as the "landlord" under the Caldor lease. A memorandum of the ground lease, executed on July 21, 1987, was recorded in the Camden County Book of Deeds on August 5, 1987. On July 31, 1992, the Baker entities assigned their interests in the ground lease to plaintiff, a limited partnership. Baker was one of the limited partners of plaintiff. In 1992, he owned 51% of plaintiff. According to Baker, this assignment, which was recorded on August 3, 1992, also had the effect of conveying to plaintiff all of the Baker entities' interest in the Caldor lease and in the Associated guarantee.
According to R. Dean Wolfe, defendant's executive vice president, defendant tried to avoid subleasing property on which it operated a store because subleasing created a risk that the subtenant might lose its right to occupy the premises through no fault of its own, such as if the ground lease was terminated or if the tenant under the ground lease defaulted. If defendant did sublease, it insisted on assurances, typically in the form of a non-disturbance agreement with the landowner, whereby the owner agreed that the subtenant may continue to occupy the premises even if the lessee under the ground lease lost its lease with the owner.
Wolfe claimed that Caldor did not enter into any such non-disturbance agreement here. Kuller did not know if any such agreement was obtained. However, he admitted that, under the terms of the ground lease, Caldor had the right to obtain a non-disturbance agreement from the ground lessor.
With respect to non-disturbance agreements, the ground lease provided:
Provided that the first institutional fee mortgagee has executed and delivered to a subtenant a non-disturbance agreement or such mortgagee has requested Landlord to execute and deliver a non-disturbance agreement to said subtenant, then Landlord agrees that, upon Tenant's request, Landlord will promptly execute and deliver, in form for recording, an agreement with such subtenant whereby such subtenant agrees to attorn to landlord in case of any termination of this Lease and Landlord agrees it will not cut off such sublease of the leasehold estate created thereunder nor disturb such subtenant's possession under its sublease upon any termination of this Lease, unless such subtenant shall be in default under its sublease. Upon such attornment the sublease shall continue in full force and effect as, or as if it were, a direct lease between the Landlord and the subtenant upon all of the terms, conditions and covenants as are set forth in the sublease and shall be applicable after such attornment except [as otherwise provided].
*616 Baker claimed that Caldor never asked that a non-disturbance agreement be executed between it and Somerdale Realty. The only non-disturbance agreement executed by Caldor was one dated September 14, 1990, between it and Metropolitan Life Insurance Company. Metropolitan agreed to make a loan to the Baker entities which was to be secured by a mortgage on the shopping center premises. Metropolitan and Caldor agreed that the lien of Caldor's lease would be subordinate to the mortgage. They also agreed that, as long as the lease was in effect and Caldor was not in default, Metropolitan would not evict Caldor and Caldor's right of possession under the lease would not be terminated, disturbed or interfered with by a mortgage foreclosure. Any sale of the shopping center pursuant to the exercise of Metropolitan's rights under the mortgage would be made subject to Caldor's lease. In the event Metropolitan became a successor landlord, the lease would continue as a direct lease between Caldor and the successor landlord and Caldor would attorn to the successor landlord.
Caldor's possession of the property was never in fact disturbed by the ground lessor or anyone else, and Caldor continuously occupied the premises until April 30, 1999. In September 1995, Caldor filed a voluntary petition for relief under Chapter 11 of the United States bankruptcy code in the bankruptcy court for the Southern District of New York. It continued, however, to operate its store at the Somerdale shopping center, and plaintiff did not know whether Caldor would reorganize. In August 1996, plaintiff filed a proof of claim in the Caldor bankruptcy. According to Baker, this proof of claim was filed to preserve plaintiff's right to claim a distribution from the bankrupt's estate for monies Caldor owed plaintiff prior to filing its petition.
In January 1999, plaintiff learned that Caldor would be vacating the premises. Plaintiff immediately began looking for a new tenant for the location. In February 1999, Caldor had a going-out-of-business sale that was authorized by the bankruptcy court. Also, in the first quarter of 1999, Caldor held an auction for its lease but there were no interested bidders.
The only company that expressed an interest in the property was Ames Realty II, Inc. On April 26, 1999, plaintiff reached a verbal agreement with Ames on a proposed lease. On April 30, 1999, the bankruptcy court entered an order approving Caldor's motion to reject the lease on the property. Plaintiff filed another proof of claim in bankruptcy court on May 19, 1999.
From May 1999 to November 1999, subject to a reservation of rights, defendant honored the guarantee agreement and voluntarily paid plaintiff all of Caldor's obligations under the lease. In the meantime, plaintiff was still negotiating with Ames with respect to a new lease and kept defendant apprised of these negotiations.
On August 6, 1999, plaintiff entered into a lease agreement with Ames. The lease ran until 2020, with options to renew until 2034. Annual rent at the commencement of the lease was $303,796.80, and rose to $499,392 in 2020, thus leaving plaintiff with a shortfall which it alleged defendant, as Caldor's guarantor, was obligated to pay. Although Ames began occupying the premises in July or August 1999, and opened its store in October 1999, it did not begin paying rent until February 2000.
Although defendant did not stop making voluntary payments to plaintiff until December 1999, plaintiff's complaint was filed in September 1999 and it first moved for summary judgment on liability in January 2000. In opposing summary judgment, defendant asserted that plaintiff had failed to prove a good faith effort to mitigate its *617 damages and that summary judgment was premature given the absence of discovery and defendant's limited knowledge of the facts. Specifically, defendant alleged that it did not sign the lease or guarantee agreement and that it had no connection to either Caldor or Associated when these documents were executed. Defendant claimed that it needed to discover: the circumstances surrounding the execution of the guarantee; plaintiff's efforts to mitigate damages; whether plaintiff's filing of a proof of claim in bankruptcy court operated to terminate the lease; whether changes made to the Caldor lease released the guarantor; whether plaintiff's relationship to Caldor's original landlord gave it any rights to enforce the guarantee; and whether plaintiff had surrendered the lease.
At oral argument on the motion, defendant claimed that it was still seeking necessary documentation from plaintiff and that the succession of the various parties in interest had not yet been verified. With respect to the issue of surrender, defendant asserted that this may have occurred by virtue of plaintiff's having negotiated with the new tenant prior to Caldor's vacating the premises. If plaintiff had accepted a surrender of the premises, no further rent would be due under the lease or guarantee. With respect to the issue of termination, defendant argued that case law held that the filing of a proof of claim in bankruptcy court could be deemed a termination of the lease and of any concomitant obligation under a guarantee agreement.
The court denied plaintiff's motion as premature and held that discovery would be limited to the following three issues: whether plaintiff was the proper party to enforce the guarantee agreement; whether plaintiff's filing of a proof of claim in bankruptcy court terminated the lease; and whether plaintiff's actions with respect to the new tenant constituted an acceptance of surrender of the lease.
Following discovery, in July 2000 plaintiff renewed its motion for summary judgment on liability. In opposing summary judgment, defendant asserted only that the guarantee agreement was not enforceable because there had been no meeting of the minds and that, alternatively, defendant was entitled to rescind the agreement because of unilateral mistake. It also sought leave to file an amended answer to assert these newly raised defenses.
Specifically, defendant asserted that there was no meeting of the minds because ownership of the underlying property had been an essential material fact of the guarantee agreement and because the lease agreement had warranted that plaintiff's predecessor was the owner. Defendant claimed that the risks were fundamentally different between a lease and sublease and that plaintiff had failed to show that Associated knew it was guaranteeing a sublease. The facts showed that the ground lease was not executed until four months after Associated guaranteed the lease modification on behalf of Caldor, and defendant argued that Associated had no obligation to search deed books for a subsequent recording of any memorandum of that ground lease. Defendant had been prejudiced because Caldor never received any non-disturbance agreement from the property owner.
The court rejected all of defendant's arguments. It noted that the guarantee agreement which defendant's predecessor had signed said nothing about its being in consideration of any warranties or representations made in the lease. Rather, the guarantee was made in consideration only of the landlord's having executed the lease with Caldor. Although the location of the property changed after Associated signed *618 the guarantee, Associated subsequently accepted, in writing, that lease modification. Moreover, Caldor's possession and occupancy of the premises were never disturbed or interfered with any way. Caldor thus got the benefit of its bargain under the lease, a bargain that had been guaranteed by Associated. The court accordingly found no material mistake warranting rescission of the guarantee agreement and no point in granting defendant leave to file an amended answer. The court entered summary judgment in plaintiff's behalf on liability.
On September 28, 2000, the parties entered into a consent order with respect to the conduct of discovery on the issue of damages. On November 16, 2000, the parties entered into another consent order, dismissing defendant's defenses and counterclaim with respect to damages, and agreeing on the amount of damages to be paid by defendant to plaintiff.
On November 15, 2000, plaintiff moved for attorneys' fees pursuant to the frivolous litigation statute, N.J.S.A. 2A:15-59.1. After hearing argument on December 1, 2000, the court reserved decision and issued an opinion on December 29, 2000 awarding plaintiff attorney's fees solely with respect to three discrete areas of litigation and directing plaintiff's attorney to identify the fees which pertained to those three areas.
Both parties moved for partial reconsideration of this order. On February 16, 2001, the court heard argument and on March 9, 2001 entered orders reaffirming its earlier ruling, denying both parties' motions for reconsideration, and denying a portion of plaintiff's request for fees. On March 12, 2001, the court issued a written opinion to support these rulings, and on June 19, 2001, issued another written opinion setting the amount of attorney's fees at $17,713 plus costs of $2000.
On August 7, 2001, the court entered final judgment in the matter, incorporating by reference all of its earlier orders and opinions, and awarding plaintiff damages in the amount of $440,938.09 through July 1, 2001. Future damages were to be set in accordance with the parties' consent order of November 16, 2000. This appeal followed.

I
Defendant contends that the court erred in entering summary judgment in plaintiff's favor because the parties never entered into a contract of guarantee of a sublease or, alternatively, because any such contract should have been rescinded on the ground of unilateral mistake. Plaintiff responds, among other things, that the guarantee agreement was unconditional and enforceable as a matter of law, that there was no evidence defendant was misled or acted by mistake, and that the remedy of rescission was not available because both parties substantially performed under the contract.
By the time of plaintiff's renewed summary judgment motion, defendant had abandoned all of its previously asserted defenses and the only remaining issue before the trial court was whether a guarantee agreement for a commercial lease may be enforced where the underlying lease agreement turns out to be a sublease because the purported property owner turns out to be a lessee pursuant to a long-term ground lease. In our view, resolution of this narrow legal issue lent itself to disposition by way of summary judgment. R. 4:46-2(c); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). Our analysis must therefore begin with the law of guarantee agreements.
When resolving questions as to the interpretation of contracts of guarantee, *619 we look to the rules governing construction of contracts generally. Garfield Trust Co. v. Teichmann, 24 N.J.Super. 519, 526, 95 A.2d 18 (App.Div.1953); First Bank & Trust Co. v. Siegel, 36 N.J.Super. 207, 210, 115 A.2d 152 (Law Div.1955). Guarantee agreements should be strictly construed and their language interpreted most strongly against the party at whose insistence such language was included. Nat'l Westminster Bank N.J. v. Lomker, 277 N.J.Super. 491, 498-99, 649 A.2d 1328 (App.Div.1994), certif. denied, 142 N.J. 454, 663 A.2d 1361 (1995); Housatonic Bank & Trust Co. v. Fleming, 234 N.J.Super. 79, 82, 560 A.2d 97 (App.Div.1989); Garfield Trust v. Teichmann, supra, 24 N.J.Super. at 527, 95 A.2d 18; First Bank v. Siegel, supra, 36 N.J.Super. at 210, 115 A.2d 152.
It is fundamental that a guarantor is not bound beyond the strict terms of its promise and its obligation cannot be extended by implication. Housatonic Bank v. Fleming, supra, 234 N.J.Super. at 82, 560 A.2d 97. For example, an agreement guaranteeing the particular debt of another does not extend to any other indebtedness not within the intention of the parties. Garfield Trust v. Teichmann, supra, 24 N.J.Super. at 527, 95 A.2d 18. Nevertheless, the terms of a guarantee agreement must be read in light of commercial reality and in accordance with the reasonable expectations of persons in the business community involved in transactions of the type involved. Mt. Holly State Bank v. Mt. Holly Washington Hotel, Inc., 220 N.J.Super. 506, 511, 532 A.2d 1125 (App.Div.1987). While any ambiguity should be construed in favor of the guarantor, the agreement should be interpreted according to its clear terms so as to effect the objective expectations of the parties. Housatonic Bank v. Fleming, supra, 234 N.J.Super. at 82, 560 A.2d 97.
Of course, a meeting of the minds is an essential element to the valid consummation of any contract. Gross v. Yeskel, 100 N.J. Eq. 293, 294, 134 A. 737 (E. & A.1926). While a unilateral mistake by a guarantor as to the nature of the underlying transaction is not a basis for relief, if the mistake is such that the parties never mutually agreed to the terms of the guarantee contract, then the document will not be enforced against the guarantor. 38 Am.Jur.2d Guaranty § 53 at 913-14 (1999). This is what defendant contends happened here, i.e., that the parties never agreed that defendant would guarantee a sublease.
As indicated, plaintiff's predecessor and Caldor never modified their lease in writing to reflect the fact that plaintiff's predecessor never became the fee simple owner of the property. The record is silent as to why. Nevertheless, the law with respect to alterations of the underlying obligation is analogous to the instant situation, since defendant is arguing that the court held it answerable for the terms of a contract far different from the one it thought it was guaranteeing.
Some courts require that if a guarantor is to be released from its agreement, the change in the principal contract must actually injure the interest of the guarantor or must expose the guarantor to an increased or fundamentally different risk. Ibid. Thus, some courts define a "material" change in the underlying contract as one which injures the guarantor or increases its risk of injury, while others hold that a material change is one which increases or decreases the guarantor's liability, regardless of injury or benefit; on the other hand, still others hold that any change in the underlying obligation discharges the *620 guarantor, even if not material or prejudicial. Id. at 941-42.[1]
Applying these principles here, we conclude, as did the trial court, that the terms of the guarantee agreement signed by Associated provided for an unconditional guarantee of rent payments by Caldor. Although it is not clear who drafted the agreement, both parties to the agreement were large commercial corporations, presumably represented by counsel. Moreover, it is safe to assume, based on commercial reality, that, but for Associated's execution of this guarantee, plaintiff's predecessor would not have entered into the lease agreement with Caldor, which was Associated's subsidiary.
While defendant is correct that the underlying lease warranted that plaintiff's predecessor was the fee simple owner of the premises, that representation was made to Caldor, as tenant, not to Associated, as guarantor. Moreover, the guarantee agreement provided that it was made solely in consideration of plaintiff's predecessor having entered into the lease at Associated's request. Hence, we reject defendant's argument that Associated gave its guarantee in reliance on the representation contained in the lease that plaintiff's predecessor owned the land.
The question still remains, however, whether the change in the status of plaintiff's predecessor from a property owner to a ground lessee should have operated to discharge defendant from liability under the guarantee. We conclude that it did not. The change did not affect Caldor's obligation to pay rent under the lease, since Associated expressly agreed that any modification of the lease would not release it from liability or "terminate, affect or diminish the validity of" the guarantee except if Caldor's liability was "released, terminated, affected or diminished," and while the change may have theoretically increased defendant's risks under the guarantee, it never resulted in any actual injury or prejudice to it.
In S-Mart, Inc. v. Sweetwater Coffee Co., Ltd., 744 N.E.2d 580, 583 (Ind.Ct. App.), transfer denied, 761 N.E.2d 416 (Ind.2001), an amendment to a commercial lease allowed the landlord to use a portion of the tenant's premises to operate a business that was, essentially, in competition with that of the tenant. The landlord never disputed the fact that the amendment constituted a material alteration of the lease, but merely argued that the guaranty contained in its lease, by its express terms, was enforceable even in the face of "any and all" modifications, even material ones. Id. at 585.
*621 In holding that the guarantor was discharged from liability, the Indiana appellate court held that the amendment changed the relationship of the landlord and tenant to that of business competitors and that this competition increased the risk of loss to the tenant. Id. at 586-87. In the absence of consent, where a guarantee agreement provides that it applies to modifications, the guarantee will extend only to modifications that are nonmaterial alterations of the underlying agreement and to material alterations shown to be within the contemplation of the parties at the time the agreement was executed. A material alteration is one which alters the legal identity of the principal's contract, substantially increases the risk of loss to the guarantor, or places the guarantor in a different position. Id. at 586 (citations omitted).
In Mangold v. Keip, 177 Misc.2d 953, 679 N.Y.S.2d 240, 241 (Sup.Ct.App. Term 1998), the lease renewal contained a condition not present in the original lease, permitting the landlord to terminate the lease without qualification in the event a use violation was placed on the premises. Because the guarantor had not consented to this material change in the lease, it was released from liability, notwithstanding the fact that the change did not increase the guarantor's risk. Ibid.
In granting summary judgment to plaintiff here, the trial judge noted that, while there was an increased risk that Caldor's quiet enjoyment of the leased premises could have been disturbed by plaintiff's predecessor's default in its ground lease with Somerdale, or by a termination of that ground lease, that risk never came to pass. That is, for the entire time that Caldor occupied the premises, it had full use and enjoyment of the premises and the existence of the ground lease was never at issue.
We agree with this reasoning. Even if the ground lease had been terminated, or plaintiff's predecessor had defaulted thereunder, thus giving Somerdale the right to terminate Caldor's "sublease," that event would have relieved Caldor of any further obligation to pay rent and would have thus operated to discharge defendant (or Associated) from liability under the guarantee agreement. See Applebee's Northeast, Inc. v. Methuen Investors, Inc., 46 Mass. App.Ct. 777, 709 N.E.2d 1143, 1145 (1999) (when principal lease is terminated or otherwise fails, sublease subordinate to it ordinarily terminates or fails). Under that scenario, then, any increased risk to defendant or Associated was more illusory than real.
Moreover, as plaintiff points out, the ground lease between Somerdale and plaintiff's predecessor provided that Somerdale would offer a non-disturbance agreement to any tenant with whom plaintiff's predecessor entered into a sublease. Although Caldor entered into such a non-disturbance agreement with Metropolitan, a first mortgagee of the premises, it never sought any such agreement from Somerdale. As a result, we agree with plaintiff that any increased risk to Associated was attributable to Caldor, not plaintiff's predecessor. Plaintiff also argues that the Metropolitan non-disturbance agreement would have been sufficient to prevent Somerdale from disturbing Caldor's tenancy, thus lending even further support for the proposition that there was no increase in any risk to Associated.
Nevertheless, as noted above, courts from other jurisdictions have supported the proposition that a material change to the underlying contract does not have to increase the guarantor's risk in order to discharge the guarantor. The issue does not appear to have arisen in New Jersey. As previously indicated, in *622 our opinion the better view is to treat as material only those alterations which actually increase the guarantor's risk or liability. Thus, we agree with the Restatement rule that a modification of the obligation between the principal obligor and the obligee does not discharge the secondary obligor unless "the modification creates a substituted contract or imposes risks on the secondary obligor fundamentally different from those imposed pursuant to the transaction prior to modification...." Restatement (Third) of Suretyship and Guaranty § 41(b)(i)(1996).[2] Noting that the traditional rule, that a secondary obligor was completely discharged by a modification of the underlying obligation, "was often applied in a mechanical, almost mindless way," the Restatement chose to adopt "the more modern policy ... of discharging the secondary obligor only to the extent it would otherwise suffer loss as a result of the modification." Ibid. (Reporter's Note). See In re Meyer, 120 F.3d 66, 71 (7th Cir.1997); American Oil Co. v. Valenti, 179 Conn. 349, 426 A.2d 305, 308 (1979); Friedman v. Millpit Corp., 49 Conn.App. 354, 713 A.2d 1288, 1290 n. 3 (1998), certif. denied, 247 Conn. 925, 719 A.2d 1168 (1998) (quoting Restatement); Bumila v. Keiser Homes of Maine, Inc., 696 A.2d 1091, 1094 (Me.1997); Lloyd Corp. v. O'Connor, 258 Or. 33, 479 P.2d 744, 746, (1971); Austin Hardwoods Inc. v. Vanden Berghe, 917 S.W.2d 320, 326 (Tex.App. 1995) ("A material alteration is an alteration of the underlying debt that either injures or enhances the risk of injury to the guarantor") (citing United Concrete Pipe Corp. v. Spin-Line Co., 430 S.W.2d 360, 365-66 (Tex.1968).)
Because Caldor was never actually disturbed in its enjoyment of the leased premises, because any such disturbance would not have increased defendant's liability in any event, and because Associated expressly agreed to be bound, without notice, by any modification to the lease, we conclude that the guarantee contract was properly enforced here and that this interpretation of the guarantee contract accords with commercial reality and effectuates the intentions of both parties. As the court said in Young v. American Bonding of Baltimore, 228 Pa. 373, 77 A. 623, 626 (1910), the change at issue here was not such as a "careful and prudent person undertaking the risk would have regarded as substantially increasing the chances of loss."
We note that defendant's argument is not really premised on the concept that the underlying lease obligation was modified. Rather, it has hinged its appellate argument on the principle that there never was a meeting of the minds, or alternatively, that a contract may be rescinded where there has been unilateral mistake. In this case the alleged "mistake" was that the landlord was the owner of the land, rather than a long term lessee. As indicated above, we believe that both the undisputed record and the legal principles pertinent thereto support the conclusion that there was a valid contract of guarantee. As for defendant's rescission argument, we believe that defendant has misapprehended the law.
Contracts may be rescinded where there is original invalidity, fraud, failure of consideration, or material breach *623 or default. Hilton Hotels Corp. v. Piper Co., 214 N.J.Super. 328, 336, 519 A.2d 368 (Ch.Div.1986). The remedy is discretionary with the court and should not be granted where there has been substantial performance of the contract. Intertech Assocs., Inc. v. City of Paterson, 255 N.J.Super. 52, 59, 604 A.2d 628 (App.Div. 1992); Hilton Hotels v. Piper, supra, 214 N.J.Super. at 336, 519 A.2d 368. The court must be able to return the parties to the ground on which they originally stood. Ibid.
Contrary to defendant's argument, a unilateral mistake of fact, unknown to the other party, is not ordinarily grounds for avoidance of a contract. Intertech v. Paterson, supra, 255 N.J.Super. at 59, 604 A.2d 628. However, in the context of public bids made on the basis of unilateral mistake, rescission has been afforded under certain circumstances. Ibid. The existence of these "special circumstances" justifies departure from the generally controlling principle that parties are bound by the contracts they make for themselves. Id. at 59-60, 604 A.2d 628. The mistake must be of so great a consequence that it would be unconscionable to enforce the contract, the matter as to which the mistake was made must relate to a material feature of the contract, the mistake must have occurred notwithstanding the exercise of reasonable care by the party making it, and rescission must not cause serious prejudice to the other party, except for loss of its bargain. Id. at 60, 604 A.2d 628; Conduit & Foundation Corp. v. Atlantic City, 2 N.J.Super. 433, 440, 64 A.2d 382 (Ch.Div.1949). Mistake is when a person, under some erroneous conviction of law or fact, does some act which, but for the erroneous conviction, he or she would not have done. Conduit v. Atlantic City, supra, 2 N.J.Super. at 440, 64 A.2d 382.
In addition to the fact that this case arises in a purely private commercial context, rather than in a public bidding context, defendant has not shown its entitlement to the remedy of rescission. For many of the reasons discussed above, we do not believe the so-called mistake made by defendant's predecessor related to a material feature of the contract. That is, the identity of the owner of the underlying land was not material to the guarantee contract in the circumstances of this case. Also, the alleged "mistake" was not of such great consequence as to render enforcement of the contract unconscionable. There is nothing unconscionable about expecting defendant to live up to the bargain its predecessor made to induce plaintiff's predecessor to enter into a lease agreement with Caldor.
We also do not believe that defendant's predecessor took all reasonable care in protecting its own rights. As Caldor's parent company, Associated was in a position to monitor the circumstances under which Caldor's lease agreement was executed. Caldor's representative admitted that Caldor knew that plaintiff's predecessor never took ownership of the land. While defendant argues that Associated was never apprised of this fact, and that Associated operated completely independently of Caldor, there is nothing unreasonable about expecting a parent company, when guaranteeing its subsidiary's contractual obligations, to insist upon complete disclosure from the subsidiary.
Finally, rescission would not be appropriate here since both parties have substantially performed under the contract. That is, Associated got the benefit of its bargain for more than ten years, as its subsidiary was granted unfettered use and enjoyment of the leased premises by plaintiff's predecessor. In view of our disposition, *624 we need not address plaintiff's additional arguments in support of affirmance.

II
Defendant claims that the court erred in refusing to permit an amendment of the answer to assert additional defenses based on the newly discovered fact that plaintiff's predecessor never owned the premises in question. Because the defenses that defendant sought to assert were the very ones the court considered and rejected, and which we discussed above, we find no error.
According to R. 4:9-1, once a responsive pleading has been filed, "a party may amend a pleading only by written consent of the adverse party or by leave of court which shall be freely given in the interest of justice." The decision whether to grant such a motion rests within the court's sound discretion. Kernan v. One Washington Park Urban Renewal Assocs., 154 N.J. 437, 456-57, 713 A.2d 411 (1998); Fisher v. Yates, 270 N.J.Super. 458, 467, 637 A.2d 546 (App.Div.1994). Significantly, courts are free to refuse leave to amend when the newly asserted claim is not sustainable as a matter of law. Interchange State Bank v. Rinaldi, 303 N.J.Super. 239, 257, 696 A.2d 744 (App.Div.1997). This is because there is no point in permitting an amended pleading when a subsequent motion to dismiss must be granted. Ibid.
When defendant opposed plaintiff's second summary judgment motion, it also cross-moved for leave to file an amended answer and counterclaim. The proposed amended answer asserted, as additional defenses, that the guarantee agreement was not an enforceable contract and that defendant was entitled to rescind it on the basis of unilateral mistake as to the ownership of the premises. The proposed answer also included, as an additional counterclaim, restitution for any rent voluntarily paid by defendant after Caldor vacated the premises. Defendant claimed that it was not until Baker's deposition of May 18, 2000, that it learned that plaintiff's predecessor never owned the land.
As previously discussed, in granting plaintiff's motion for summary judgment on liability, the court considered all of defendant's arguments regarding the non-enforceability of the guarantee agreement based on the ownership of the land. The court expressly denied defendant's motion for leave to amend its answer and counterclaim, ruling that it would be unnecessary to grant the motion since all of those issues had been resolved by way of plaintiff's motion for summary judgment. We agree.

III
Defendant claims that the court erred in awarding plaintiff attorneys' fees pursuant to the frivolous litigation statute. N.J.S.A. 2A:15-59.1. We disagree.
Plaintiff moved for attorneys' fees after its summary judgment motion on liability was granted and the parties settled on damages. Plaintiff contended that defendant had successfully opposed plaintiff's first motion for summary judgment on the ground that additional discovery was needed to explore the issues of waiver and surrender of the lease and whether plaintiff was the proper party to enforce the guarantee agreement. According to plaintiff, defendant then propounded extensive requests for the production of documents and interrogatories, while objecting to nearly every interrogatory propounded by plaintiff. In addition, defendant deposed Baker for more than seven hours and also deposed Hills, a representative from Ames, the tenant who occupied the premises after Caldor vacated. Plaintiff claimed that Baker's deposition was characterized *625 by repeated and harassing questions by defense counsel. After plaintiff renewed its summary judgment motion, defendant abandoned all of its previously asserted defenses and raised entirely new defenses. Once plaintiff was granted summary judgment on liability, defendant alleged, among other things, that plaintiff had failed to mitigate damages and discovery proceeded on that issue until defendant withdrew all of its defenses with respect to damages and entered into a consent order with plaintiff.
Plaintiff thus sought fees of $103,178 and costs of $4947.35, for work done during seventeen months of litigation through October 31, 2000, comprising more than 482 hours of professional and para-professional services. Plaintiff alleged that defendant engaged in aggressive and frivolous litigation tactics and that it abandoned its liability defenses after four months of wasteful discovery. The services rendered by plaintiff's attorneys were required because of defendant's bad faith refusal to acknowledge liability and to pay damages.
Judge Zucker-Zarett issued a written opinion on December 29, 2000, supplemented by opinions of March 12, 2001 and June 19, 2001. Having reviewed the record in light of the applicable law, we affirm the counsel fee award substantially for the reasons set forth by Judge Zucker-Zarett in her careful and detailed opinions.
Affirmed.
NOTES
[1] In the specific context of guarantees of lease agreements, the same text states that a material alteration or departure from the contract of guarantee, without the guarantor's consent, will discharge the guarantor whether or not it is prejudiced, 49 Am.Jur.2d Landlord & Tenant § 822 at 671 (2d ed.1995). However, the only cases cited in support of that broad proposition were from Arkansas, Arkansas Industrial Development Comm'n. v. FABCO, 312 Ark. 26, 847 S.W.2d 13, 16 (1993) (citing Inter Sport, Inc. v. Wilson, 281 Ark. 56, 661 S.W.2d 367, 368 (1983)), and Vermont, Stern v. Sawyer, 78 Vt. 5, 61 A. 36 (1905). For reasons addressed hereafter, we do not find those authorities persuasive. The only other case cited, Lloyd Corp. v. O'Connor, 258 Or. 33, 479 P.2d 744, 746 (1971), does not support the proposition at all. The text goes on to cite cases holding that examples of material alterations in a lease include changes in the terms of the lease, changes in the time for payment of rent, changes in the amount of rent, or the sale of the leased premises by the lessor, although here again the decisions are not unanimous. Id. at 671-72. See Silver v. Friedman, 18 N.J.Super. 367, 371, 87 A.2d 336 (App.Div.1952) (if lease prohibits assignment or subletting, guarantor will be discharged if lease is assigned or premises are sublet without its consent).
[2] "New Jersey typically gives considerable weight to Restatement views, and has, on occasion, adopted those views as the law of the State when they speak to an issue our courts have not yet considered." Citibank v. Estate of Simpson, 290 N.J.Super. 519, 530, 676 A.2d 172 (App.Div.1996). See also New Jersey Economic Development Authority v. Pavonia Restaurant, 319 N.J.Super. 435, 448, 725 A.2d 1133 (App.Div.1998). This is an appropriate case in which to look to the Restatement for guidance.