**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0017-23

2430 MORRIS AVENUE, LLC,

      Plaintiff-Appellant/
      Cross-Respondent,

v.

DEBORAH GRAMMER,
as the Administrator of
the Estate of Lee Weinstein,
and MARTIN IPPOLITO,

      Defendants-Respondents/
      Cross-Appellants.

_____

      Argued January 28, 2025 – Decided October 8, 2025

      Before Judges Smith and Chase.

      On appeal from the Superior Court of New Jersey, Chancery Division, Union County, Docket No. C-000044-22.

      Jonathan T. Guldin argued the cause for appellant/cross-respondent (Clark Guldin Attorneys at Law, attorneys; Jonathan T. Guldin and Gregory J. Getrajdman, of counsel and on the briefs).

Raquel Romero argued the cause for respondents/cross-appellants (Law Office of Raquel Romero, attorneys; Raquel Romero and Mary Ann Serino, on the brief).

The opinion of the court was delivered by

SMITH, J.A.D.

We consider cross-appeals from the Chancery Division's order of final judgment after a trial. The dispute involved the sale of environmentally contaminated commercial property. Plaintiff, the buyer, filed a complaint alleging breach of contract and the implied covenant of good faith and fair dealing. Defendant, the seller, denied liability and asserted counterclaims, alleging similar theories. After a contentious discovery period, the Chancery Division conducted a bench trial, then issued an order granting partial specific performance and dismissing each party's claims. Both sides appealed.

We affirm for the reasons which follow.

I.

2430 Morris Avenue was owned for nearly a century by Max Weinstein and Sons and various successors. The property was used as a scrap yard. Eventually, ownership passed to Lee Weinstein and Melinda Ippolito. Both are now deceased, with interests currently held by defendants, Deborah Grammer, Administrator of the Estate of Lee Weinstein, and Martin Ippolito. Over time

2

the property has suffered significant contamination, including a 2011 oil spill by defendant's business tenant. After the spill, defendants retained environmental consultants to assist them with the cleanup effort. The consultants were Edward Sullivan, a licensed site remediation professional (LSRP), and Joseph Lockwood. Faced with a substantial cleanup project and burdened with property management challenges, defendants eventually decided to sell the property. They entered into a purchase and sale agreement (PSA) with plaintiffs in September 2019 for a price of $1,000,000.

Article 11 of the PSA is entitled, "Condition of Property and Environmental Matters." The environmental obligations of the parties were defined in subsection 11.2:

> Environmental Obligations. Except for Purchaser's Environmental Obligations as expressly set forth herein, and subject to the provisions of this Article 11, Seller agrees, at Seller's cost, from on or after the Effective Date not to place upon nor permit the placing at, on or under the Premises of any hazardous materials. Seller shall after the Effective Date cooperate with Purchaser and Purchaser's LSRP to secure prior to Closing of to[1] the extent possible a site-wide RAO [(Response Action Outcome)] of all AOC's [(areas of concern)] comprising the Groundwater Obligations. The preceding sentence, together with Seller's

---

[1] Our careful review of the record reveals that "of to" is an accurate recitation of paragraph 11.2 from the PSA. Unless otherwise indicated, we have reproduced the exact language from the agreement.

obligations set forth in this Article 11, are sometimes collectively referred to herein as "Seller's Environmental Obligations". In addition to Seller's Closing deliverables set forth herein, the parties agree that as conditions precedent to Purchaser's obligation to Close, Seller, at its sole cost and expense, shall have completed the following:

> (i) complied with the requirements of ISRA [(Industrial Site Recovery Act)] including, without limitation, the execution, filing and posting as necessary of a General Information Notice and Remediation Certification, and

> (ii) deliver to Purchaser any and all correspondence to and from NJDEP relating to the Premises including but not limited to all demands and/or requirements related in any manner to the Premises.

According to subsection 11.2(b), plaintiff could opt to cancel the contract or extend the closing date in the event defendants had not timely satisfied their environmental obligations:

> It is agreed that from and after the Effective Date Purchaser, in the event Seller has not fully completed all of the above requirements then prior to Closing, the Purchaser may either cancel this Agreement or extend the date for Closing for such period as determined by Purchaser to be appropriate to allow for completion by Seller of the said obligations. If Purchaser elects to terminate this Agreement the Deposit shall be immediately refunded by Purchaser as herein required.

4

After the PSA was executed, the parties experienced difficulties and delays working together to timely complete and submit the required Remedial Investigation Report (RIR) to the New Jersey Department of Environmental Protection (NJDEP). Plaintiff blamed defendants and their consultants for the delay and issued a notice of default under the PSA in May 2020. In December 2021, more than a year later, Edward Sullivan filed the RIR for the property with the NJDEP on behalf of defendants. He did so without submitting the RIR to plaintiffs or their environmental consultants for review in advance. Plaintiffs claimed that the RIR submitted by defendants was deficient and served defendants with a second default notice. In the default notice letter, plaintiff's counsel also stated:

> Since the execution of the Purchase and Sale Agreement for the Property nearly [three] years ago there has been a continuing pattern of delay and failure by [defendants'] environmental consultants. While my client has been more than patient through the continuing failures and defaults it has become clear that the transaction needs to be materially adjusted in order to advance.
>
> In an effort to salvage the transaction and avoid litigation my client suggests that the Agreement be revised to allow the [plaintiff] to assume the responsibility for completion of the [defendants'] "Environmental Obligation" set forth in the Agreement and that in consideration thereof the Purchase Price be reduced to reflect the value of such responsibility.

5

Shortly thereafter, plaintiff sued defendants seeking specific performance of defendants' environmental obligations under the PSA. Defendants answered and counterclaimed. During discovery, the trial court rejected plaintiff's motion to depose defendant's real estate transaction attorney, issuing a protective order.

After a bench trial, the Chancery Division dismissed both sides' breach of contract and implied covenant claims, but it granted partial specific performance.

To reach its determination, the court reviewed voluminous documentary evidence and heard testimony from the following witnesses: Francisco Alessi, Robert Benecke, Martin Ippolito, Christopher Ward, Deborah Grammer, Andrew Trzcinski, Edward Sullivan, Vincenzo Alessi, and Joseph Lockwood.

After making detailed credibility findings, the court made equally detailed factual findings. The court found: the PSA spelled out the parties' responsibilities; the PSA permitted plaintiff to extend or delay the time in which defendants had to complete certain obligations; the PSA expressly permitted plaintiff to cancel it in "certain circumstances"; the PSA had been extended once, but not canceled; paragraphs 11.2 and 11.3 of the PSA controlled as to defendants' environmental obligations; that plaintiff was "not the same LLC that originally signed the PSA," but defendants waived the issue; plaintiff's LSRP

6

consultant, who "took the lead" in securing a RAO for the property, did not have sole responsibility in this area; and finally that defendants' right to communicate directly with the NJDEP was limited by the PSA.

In its comprehensive written opinion, the court stated:

> Overall, the Court finds that the reasonable language and intent of the parties upon executing the September 19, 2019 Purchase and Sale Agreement were to have Plaintiff and its LSRP primarily responsible for obtaining the RAO. In turn, Defendants were required to cooperate with Plaintiff's LSRP towards achieving that goal and prohibited from communicating directly with the NJDEP about that process. The Court also recognizes that all parties are in agreement that it was the Defendants' obligation to finalize and submit an RIR prior to the closing.
>
> [(Citations omitted).]

The court ultimately found, "the obligations of the parties pursuant to the PSA would be for Defendants to complete the RIR to the satisfaction of the NJDEP and subsequently turn over responsibility for the remaining remediation to Plaintiff." The court also found, "as the RIR has only recently been finalized, . . . [d]efendants' alleged failure to turn over their communications with the NJDEP prior to this litigation . . . does not constitute a breach of the September 19, 2019 Purchase and Sale Agreement." Applying contract and equitable principles to plaintiff's claims, the court found: defendant did not breach the

7

agreement; reformation of the contract was not warranted; and defendants did not breach the implied covenant of good faith and fair dealing.

Turning to the counterclaim, the court found that defendants waived their LLC formation claim, and that where "[p]laintiff has not sought to cancel the contract . . . they are also not in breach as a result of prematurely or impermissibly declaring a dissolution of the agreement." The court determined that defendants failed to establish the elements of a breach of contract claim or a claim for breach of the covenant of good faith and fair dealing.

The court found that:

> [I]t is uncontested by all parties that the PSA is a valid contract that was executed by both [p]laintiff and [d]efendants. As discussed extensively above, the court further finds that the terms of the PSA are "expressed in such fashion that the court can determine, with reasonable certainty, the duties of each party and the conditions under which performance is due." Marioni v. 94 Broadway, Inc., 374 N.J. Super. 588, 598-99 (App. Div. 2005).
>
> Pursuant to the [c]ourt's . . . analysis, the [c]ourt again finds that [d]efendant's obligations under the PSA were to submit an RIR that met the standards required by the NJDEP. Following this submission and the NJDEP's acceptance of the RIR, [p]laintiff shall take title to the [s]ubject [p]roperty and take over primary responsibility for completing the remediation and obtaining a sitewide RAO for the [s]ubject [p]roperty. Further, upon transfer of title, [d]efendants shall provide [p]laintiff with all their previous

8

communications with the NJDEP, to the extent that they have not already done so. The [c]ourt finds that it has received no argument or evidence that would suggest the aforementioned provisions and performance would be harsh or oppressive to either party.

The court granted specific performance, ordering:

The parties shall have 30 days from the date of this Order to close on the sale and transfer title of the [s]ubject [p]roperty from the [d]efendants to [p]laintiff. At this closing, [d]efendants shall turn over all communications they have had with the NJDEP in relation to the remediation efforts of the [s]ubject [p]roperty (to the extent that [d]efendant's not already done so as a part of this litigation). Upon the transfer of title, [d]efendants shall continue to cooperate and otherwise reasonably assist [p]laintiff in completing remediation and ultimately obtaining an RAO for the [s]ubject [p]roperty. Plaintiff shall be primarily responsible for completing that remediation and obtaining the final RAO for the entirety of the [s]ubject [s]roperty. Alternatively, the [c]ourt recognizes that [d]efendants have also expressed a repeated desire to terminate the September 19, 2019 Purchase and Sale Agreement throughout this trial. Therefore, the [c]ourt directs that if [p]laintiff does not wish to close or otherwise take ownership of the [s]ubject [p]roperty it shall have 10 days herein to provide notice to [d]efendants in writing of their intent to withdraw and terminate the contract. At such time, the September 19, 2019 Purchase and Sale Agreement shall be considered terminated by mutual consent.

Both parties appealed. Plaintiff now argues that the trial court misinterpreted the PSA when it granted partial specific performance and

9

dismissed plaintiff's other claims. Defendant cross-appealed, arguing that plaintiff's failure to obtain a stay of the judgment renders the contract unenforceable and that the PSA is unenforceable because of plaintiff's refusal to secure an RAO.

II.

Our review of a trial court's fact finding in a non-jury trial is "limited and well-established." Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). "[F]indings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Ibid. (quoting Cesare v. Cesare, 154 N.J. 394, 411 (1998)); Cumberland Farms, Inc. v. N.J. Dep't of Env't Prot., 447 N.J. Super. 423, 437 (App. Div. 2016).

> Considering first the scope of our appellate review of judgment entered in a non-jury case, as here, we note that our courts have held that the findings on which it is based should not be disturbed unless "* * * they are so wholly insupportable as to result in a denial of justice," and that the appellate court should exercise its original fact finding jurisdiction sparingly and in none but a clear case where there is no doubt about the matter.
>
> [Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 483–84 (1974) (quoting Greenfield v. Dusseault, 60 N.J. Super. 436, 444 (App. Div. 1960)) (alteration in original).]

Our review of contract interpretation is de novo, applying the "familiar rules of contract interpretation.'" Serico v. Rothberg, 234 N.J. 168, 178 (2018); see also Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 612, 615 (2020).

We review a trial court's discovery rulings for an abuse of discretion. Brugaletta v. Garcia, 234 N.J. 225, 240 (2018); Cap. Health Sys. v. Horizon Healthcare Servs., 230 N.J. 73, 79-80 (2017).

### III.

### A.

"'Whether a term is clear or ambiguous is . . . a question of law.'" Nester v. O'Donnell, 301 N.J. Super. 198, 210 (App. Div. 1997) (alteration in original) (quoting Kaufman v. Provident Life & Cas. Ins. Co., 828 F. Supp. 275, 282 (D.N.J. 1992)). Our jurisprudence examining contract interpretation is clear and defined by established principles. Schor v. FMS Fin. Corp., 357 N.J. Super. 185, 191 (App. Div. 2002). Simply put, "we enforce the contract as written." Barr v. Barr, 418 N.J. Super. 18, 32 (App. Div. 2011) (citing Pacifico v. Pacifico, 190 N.J. 258, 266 (2007)); see also Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43 (1960). "It is well-settled that '[c]ourts enforce contracts based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract.'" Matter of Cnty. of Atl., 230 N.J. 237,

11

254 (2017) (quoting Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014) (alteration in original)); see also Serico, 234 N.J. at 178.

The starting point is always the language of the contract. Barila, 241 N.J. at 615-16. "The plain language of the contract is the cornerstone of the interpretive inquiry; 'when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result.'" Id. at 616 (quoting Quinn v. Quinn, 225 N.J. 34, 45 (2016)). "In doing so, 'the words of an agreement are given their ordinary meaning.'" Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 512 (2019) (quoting Flanigan v. Munson, 175 N.J. 597, 606 (2003) (internal quotation marks omitted)).

"Consistent with established case law, we cannot make for sellers a better or more sensible contract than the one they made for themselves." Kotkin v. Aronson, 175 N.J. 453, 455 (2003) (citing Kampf, 33 N.J. at 43). "The parties are bound by the contracts they make for themselves, with the understanding that 'a meeting of the minds is an essential element to the valid consummation' of any agreement." Barr, 418 N.J. Super. at 32 (quoting Ctr. 48 Ltd. P'ship v. May Dep't Stores Co., 355 N.J. Super. 390, 406 (App. Div. 2002)). When the language of the contract is clear and unambiguous, the words are presumed to

12

reflect the parties' intent. <u>Kieffer v. Best Buy</u>, 205 N.J. 213, 223 (2011) (citing <u>Zacarias v. Allstate Ins. Co.</u>, 168 N.J. 590, 595 (2001)). "If the language is clear, that is the end of the inquiry." <u>Chubb Custom Ins. Co. v. Prudential Ins. Co.</u>, 195 N.J. 231, 238 (2008). "A party that uses unambiguous terms in a contract cannot be relieved from the language simply because it had a secret, unexpressed intent that the language should have an interpretation contrary to the words' plain meaning." <u>Schor</u>, 357 N.J. Super. at 191.

"If the terms of the contract are susceptible to at least two reasonable alternative interpretations, an ambiguity exists." <u>Chubb</u>, 195 N.J. at 238. "In that case, a court may look to extrinsic evidence as an aid to interpretation." <u>Ibid.</u> "In the quest for the common intention of the parties to a contract, the court must consider the relations of the parties, the attendant circumstances, and the objects they were trying to attain." <u>Nester</u>, 301 N.J. Super. at 210 (quoting <u>Anthony L. Petters Diner, Inc. v. Stellakis</u>, 202 N.J. Super. 11, 27 (App. Div. 1985)).

The Court summarizes the appropriate use of extrinsic evidence in this context as follows:

> In sum, we permit a broad use of extrinsic evidence to achieve the ultimate goal of discovering the intent of the parties. Extrinsic evidence may be used to uncover the true meaning of contractual terms. It is

13

A-0017-23

only after the meaning of the contract is discerned that the parol evidence rule comes into play to prohibit the introduction of extrinsic evidence to vary the terms of the contract.

[Conway v. 287 Corp. Ctr. Assocs., 187 N.J. 259, 270 (2006).]

Indeed, "[t]his Court will generally not rewrite a valid contract to replace it with a better one, but, when strict enforcement of a contract provision would frustrate the contract's overarching purpose, the courts will intervene." Conley v. Guerrero, 228 N.J. 339, 355 (2017) (first citing Quinn, 225 N.J. at 45; and then citing Cooper v. Gov't Emps. Ins. Co., 51 N.J. 86, 93-94 (1968)).

Both sides claim that the trial court committed error by not finding a breach of contract. We are unconvinced, and we affirm for the reasons stated in Judge Robert Mega's comprehensive forty-three-page statement of reasons appended to his specific performance order. Judge Mega's findings regarding the parties' intent, reinforced by their conduct and the realities surrounding remediation, are consistent and supported by the record. Judge Mega's findings were grounded in the facts adduced at trial, and the judge used the voluminous record, including extrinsic evidence, to correctly analyze the plain language of PSA Articles 11.2 and 11.3 and conclude that neither party breached the

14

agreement. We defer to the trial court's findings and see no reason to disturb the court's sound interpretation of the contract.

We consider the other claims on appeal.

B.

"[I]n New Jersey the covenant of good faith and fair dealing is contained in all contracts and mandates that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Seidenberg v. Summit Bank, 348 N.J. Super. 243, 253 (App. Div. 2002) (quoting Sons of Thunder v. Borden, Inc., 148 N.J. 396, 420 (1997)). To succeed on a claim of breach of the covenant of good faith and fair dealing, the plaintiff must not only show that the defendant has injured their right to receive the "contractual benefits" but "must also prove the defendant's 'bad motive or intention.'" Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 110 (2007) (quoting Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 225 (2005)).

Plaintiff argues that the court erred by finding defendants' actions did not breach the implied covenant of good faith and fair dealing, contending that the facts of Brunswick are a useful comparison to those presented here. We do not agree. While Brunswick is instructive, it is not factually comparable to the

15

parties' actions parties here. The <u>Brunswick</u> Court identified specific acts of deceit and dishonesty which were designed to injure one of the parties. No comparable facts exist here, nor are any alleged. Plaintiff's sole claim is that defendants "worked surreptitiously to allegedly complete the RIR process up to and including one of the last days of trial." Yet, all parties agreed that it was defendants' duty to complete and submit the RIR with its own LSRP. The trial court did not interpret defendants' actions as ones taken with bad motives or intentions. In fact, the court determined that "in listening to [Grammer's] testimony [it] found that she was clear in her understanding of what her responsibilities entitled." We conclude that the court did not commit error on this question.

C.

Plaintiff next argues that the trial court committed error when it denied plaintiff's motion to compel the deposition of one of defendants' real estate transaction attorneys. We disagree and find the argument without merit.

We note "the scope of discovery is not infinite." <u>K.S. v. ABC Pro. Corp.</u>, 330 N.J. Super. 288, 291 (App. Div. 2000). Discovery must be limited to evidence relevant to proving the claims asserted. <u>In re Liquidation of Integrity Ins. Co.</u>, 165 N.J. 75, 82 (2000); <u>Bayer v. Twp. of Union</u>, 414 N.J. Super. 238,

16

272 (App. Div. 2010); <u>K.S.</u>, 330 N.J. Super. at 291. Moreover, "privileged" materials are not subject to discovery, and the court may enter an order limiting the scope of discovery in accordance with the Court Rules. <u>R.</u> 4:10-2.

<u>Rule</u> 4:10-2(a) provides:

> In General. Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, electronically stored information, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence; nor is it ground for objection that the examining party has knowledge of the matters as to which discovery is sought.

Here, the trial court denied the discovery motion, finding defense counsel's involvement in negotiating the PSA was protected by attorney client privilege. The court stated:

> The plaintiff is seeking discovery directly connected to a defense counsel or a counsel's communication with their client and representation of their clients in negotiation of the agreement at issue. The discovery sought regarding the details of defense counsel's communications and her actual representation of her client would fall under privilege.

A-0017-23

Further, plaintiff has failed to provide sufficient evidence or argument or good cause to overcome the presumption in favor of a protective order in this instance.

Although, plaintiff asserts that defense counsel is a fact witness to negotiations of the purchase and sale agreement, that does not appear to be the case at this time. Plaintiff is seeking information that can be directly and easily sought from the defendant Grammer herself.

Information regarding purchase and sale agreements are always in dispute between parties. And -- but trying to have the Court impede on the privilege of the attorney and client when they were negotiating their agreement is beyond the scope; and the protective order in this matter for defendant's cross-motion seeking to protect or shield its representatives at its office or its law firm from depositions is hereby going to be granted.

Here, plaintiff seeks defense counsel's deposition because she was "directly involved in the negotiations of the PSA and thereafter took positions on behalf of [d]efendants regarding the terms and conditions of the PSA, as well as compliance (or non-compliance) therewith over the course of three years as [d]efendants' transactional attorney." This blanket discovery demand could be made to any transactional attorney while representing a client. Here, plaintiff has not demonstrated that defense counsel had any "first-hand knowledge or direct involvement in the events giving rise to the action," other than that which

she discovered in the ordinary course of the professional relationship with her client. We find no abuse of discretion in Judge Mega's discovery order.

## D.

Finally, we affirm the trial court's order without further action on defendants' cross-appeal because the cross-appeal is based on information outside the record. While defendants correctly claim that plaintiff failed to request a stay of the final judgment, we conclude that failure does not warrant an order from this court voiding the contract.

To the extent that we have not addressed any other arguments by either party, it is because they lack sufficient merit to be discussed in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division